**In re KEENE CORPORATION, Debtor.**

**KEENE CORPORATION, Plaintiff,**

**v.**

**ACSTAR INSURANCE CO., Amwest Surety Insurance Co., Citibank, N.A., Continental Bank, N.A., Lumbermans Mutual Casualty Co., St. Paul Fire and Marine Insurance Co. a/k/a St. Paul/Seaboard, Shawmut Bank, N.A., and John Does 1 through 100, Defendants.**

**Bankruptcy No. 93 B 46090 (SMB).**
**Adv. Proc. No. 93–9987.**

United States Bankruptcy Court, S.D. New York.

Jan. 4, 1994.

Berlack Israels & Liberman (Edward S. Weisfelner, Carole Fern, of counsel), New York City, and Gainsburg & Hirsch (Hal M. Hirsch, of counsel), Purchase, NY, for debtor Keene Corp.

Greitzer & Locks (Gene Locks, of counsel), Philadelphia, PA, Baron & Budd (Frederick M. Baron, of counsel), Dallas TX, Levy Phillips & Konigsberg (Stanley J. Levy, of counsel), New York City, for various judgment creditors.

Gottesman, Wolgel, Secunda, Malamy & Flynn, P.C. (Steven Weinberg, of counsel), New York City, for Lumbermans Mut. Cas. Co. and Amwest Sur. Ins. Co.

Vinson & Elkins, L.L.P. (D. Bobbitt Noel, Jr., of counsel), Houston, TX, for St. Paul Fire & Marine Ins. Co.

Wilson, Elser, Moskowitz, Edelman & Dicker (Jerold R. Ruderman, Mark G. Ledwin, Carol F. Elicetta, of counsel), White Plains, NY, for Acstar Ins. Co.

Henry Paul Monaghan, New York City, for Kansas City, MO.

## MEMORANDUM AND DECISION DENYING STAY AND PRELIMINARY INJUNCTION

STUART M. BERNSTEIN, Bankruptcy Judge.

On December 3, 1993, Keene Corporation ("Keene") filed its Chapter 11 petition with this Court. At the time of the filing, Keene was a defendant in approximately 101,000 lawsuits involving asbestos-related property damage, personal injury or death. Adverse judgments, aggregating approximately $63 million, had been rendered against Keene in approximately 200 of these cases. To stay enforcement of the majority of these judgments, Keene had posted supersedeas ("appeal") bonds issued by third party sureties, or had entered into escrow arrangements with the judgment creditor's attorneys. The appeal bonds were backed by standby letters of credit which, in turn, were secured by Keene's assets. As of December 3, 1993, seventy-five judgments, aggregating nearly $29 million were final, and not subject to any further appeal.

To prevent a run on the appeal bonds, escrows and letters of credit, Keene moved at the outset of its Chapter 11 case for a temporary restraining order and a preliminary injunction. While Keene requested broad relief, the primary focus of its application sought to prevent the final judgment creditors from satisfying their judgments from the proceeds of the appeal bonds or escrows, and in the case of the appeal bonds, to prevent the sureties from drawing the proceeds of the standby letters of credit. At Keene's request, this Court issued a tempo-

rary restraining order on December 6, 1993, pending the hearing on Keene's motion for a preliminary injunction, and following three days of hearings, extended the temporary restraining order pending its determination. For the reasons set forth below, this Court vacates its temporary restraining order, and denies Keene's motion for a preliminary injunction.

## FACTS

### A. Background

Although not entirely necessary to this Court's decision, the background to this case sheds light on Keene's predicament. Keene was formed in 1967, and in 1968, acquired Baldwin–Ehret–Hill ("BEH") for approximately $8 million. BEH was engaged in the business of manufacturing acoustical ceilings, ventilation systems and thermal insulation. Certain of these products contained asbestos which was manufactured by third parties.

The acquisition of BEH embroiled Keene in asbestos-related litigation. Initially, Keene joined with other asbestos defendants in a variety of cooperative arrangements intended to maximize assets, minimize transaction costs, compensate claims and litigate when necessary. Keene also pursued litigation against its insurers, and eventually obtained $423 million in insurance coverage for asbestos-related claims as a result of that litigation.[1] Keene did not, however, recover this total sum because some of its insurers became insolvent.

Dissatisfied with these cooperative arrangements with the other asbestos defendants, Keene withdrew in June 1990, and decided to "go it alone". It established its own internal guidelines for settling asbestos-related claims and litigating when necessary. Between July 1, 1990 and November 30, 1993, Keene was able to settle or dismiss some 35,000 claims aggregating $27 million; many of the claims it could not settle, however, cost Keene dearly. Thus, for much of 1991, Keene did not have any outstanding judgments against it; by late 1991, it had $32

---

1. The details of that litigation and Keene's success can be found in *Keene v. Insurance Company of North America*, 667 F.2d 1034 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982).

million in adverse judgments. In 1992, that number jumped to $83 million, and since then, has fluctuated between $55 million and $75 million. As of the petition date, the adverse judgments exceeded $63 million.

## B. The Appeal Bonds and Escrows

Keene appealed many of these judgments. To stay enforcement, Keene posted appeal bonds issued by third party sureties or some other security arrangement consistent with the requirements of the jurisdiction in which the judgment was rendered. Keene typically worked with four different sureties who supplied the appeal bonds: Acstar Insurance Co., Amwest Surety Insurance Co., Lumbermans Mutual Casualty Co. and St. Paul Fire & Marine Insurance Co. While the precise terms of the various bonds differed, each provided, in substance, that the surety's obligation would be "void" in the event the judgment was vacated on appeal.

The appeal bonds were backed by letters of credit issued by Continental Bank, N.A. or Shawmut Bank, N.A. In the case of St. Paul, all of its surety bonds were cross-collateralized by all of the letters of credit issued in its favor. Thus, even where a judgment was reversed, the corresponding letter of credit stood as security for St. Paul's other appeal bond obligations. The surety was entitled to draw the proceeds of a letter of credit under one of two circumstances which it was required to certify to the issuing bank: the surety had paid on the bond, or the judgment creditor had made a demand on the bond.

The letters of credit were, in turn, secured by Keene's assets. In some cases, Keene entered into a security agreement with the issuing bank under which it posted collateral to secure its contingent reimbursement obligation to the issuing bank should the surety draw the proceeds of the letter of credit. In other situations, Keene placed marketable securities in a trust account at the issuing bank to secure its contingent reimbursement obligation.

As an alternative to the appeal bond, and particularly in New York, Keene and the judgment creditor's attorney entered into a court-approved escrow arrangement. Keene delivered a marketable security (generally a United States Treasury Bill) to Citibank, N.A. or Continental Bank, N.A., which held it pending disposition of the appeal. Although the escrow agreements uniformly provided that the escrow would not be considered Keene's assets or property for any purposes, Keene nonetheless retained an interest in the escrow. Like the appeal bonds, the escrow "reverted" to Keene in the event the judgment was vacated. Further, Keene reported the income earned on the escrow, and if necessary, paid taxes on account of that income.

By the time that Keene filed its Chapter 11 petition, nearly half of Keene's assets—approximately $52 million—were pledged to stay enforcement of adverse judgments.[2]

## C. The Limited Fund Action

By the end of 1992 or the beginning of 1993, Keene had reached a critical stage. It had already exhausted the substantial insurance proceeds that it had garnered through litigation. It had paid $455 million in asbestos-related judgments or claims. It had paid its own lawyers $165 million. Yet, it was a defendant in over 100,000 asbestos-related lawsuits, was a judgment debtor in many, and new claims continued to be filed at a rate of 2,000 per month. Further, it had pledged nearly half of its assets to secure the letters of credit that backed the appeal bonds or to fund the alternative escrow arrangements.

To resolve its present and future asbestos-related liability and retain some equity for its shareholders, Keene commenced an action on May 13, 1993 before Senior District Judge Jack B. Weinstein, sitting as a United States District Judge for the Eastern and Southern Districts of New York, to impose a settlement on all present and future asbestos claimants. Entitled *Keene v. Fiorelli, et al.,* 93 Civ. 2129 (JBW), 1993 WL 604077, the action sought (1) to certify a class of defen-

---

**2.** Not all judgments are secured by bonds or escrows. There are approximately $63 million in outstanding judgments, of which $52 million are backed by bonds or escrows. It appears, however, that all of the judgments that are now final are secured by bonds or escrows.

dants under Rules 23(a) and 23(b)(1)(B) comprised of all potential and actual asbestos plaintiffs, outstanding judgment creditors, and persons or entities who have sought or might seek contribution, (2) to obtain Court assistance to negotiate a settlement with Keene's limited funds, (3) to obtain injunctive relief against present and future asbestos litigation and (4) to obtain declaratory relief adjudging Keene's non-liability for asbestos-related injuries. *Keene v. Fiorelli,* 93 Civ. 2129 (JBW), 1993 WL 604077, Memorandum and Order and Preliminary Injunction, at p. 2 (E.D.N.Y., signed July 1, 1993) ("Injunction Order"). By order dated May 19, 1993, the District Court appointed former Federal Judge Marvin E. Frankel as a Special Master to hear and report on two issues: (1) were Keene's assets so limited that there was a substantial risk that payment to present and prospective claimants would be jeopardized, and (2) was there a substantial possibility that the claims of the earlier claimants would exhaust Keene's available assets and projected assets, including pertinent insurance proceeds. *Id.* at pp. 2–3.

Judge Frankel answered both questions in the affirmative in his Special Master's Report, dated June 29, 1993.[3] Judge Weinstein thereupon issued the Injunction Order on July 1, 1993, in which he preliminarily enjoined litigation and enforcement activity directed against Keene and/or its assets, as well as collection activities directed against any "bonds, escrow accounts, or letters of credit" based on any asbestos claims, judgments or settlements. Injunction Order at pp. 13–14.

In addition, Judge Weinstein provisionally certified five subclasses under Fed.R.Civ.P. 23(b)(1)(B). These subclasses included (1) present asbestos personal injury claimants, (2) future claimants, (3) creditors with "secured" judgments against Keene, (4) manufacturers and distributors of asbestos-related products who have or may have contribution or indemnity claims against Keene and (5) property damage claimants. *Id.* at p. 9. Judge Weinstein designated attorneys to represent each of the subclasses, and appointed David I. Shapiro, Esq. to serve as Special Settlement Master. *Id.* at pp. 9–11.

## D. The Settlement in Principle

Following the provisional certification of the subclasses, the parties engaged in settlement negotiations. On or about November 19, 1993, they executed a written Term Sheet which provided, in pertinent part, that Keene would transfer the majority of its assets to the claimants or an entity created for their benefit, retain certain other assets, and be absolved from further asbestos-related liability.

The only claimants entitled to a definite, fixed payment under the Term Sheet were those holding final judgments. Paragraph 5 of the Term Sheet provided:

5. With regard to any Tax Net Operating Loss (NOL) carry back refunds to be sought by Keene: ....

(b) Keene will pay by December 31, 1993, subject to order of the United States District Court for the Eastern District of New York, all outstanding judgments no longer subject to any appellate review.

The Term Sheet also provided that this subclass would be paid even if the definitive settlement agreement had not yet been approved. Paragraph 12 of the Term Sheet stated that pending Court approval of a "definitive settlement agreement", the July 1 preliminary injunction would remain in effect, and none of Keene's assets would be transferred "except as provided in paragraph 5(b)".

Although paragraph 5(b) is arguably ambiguous, any doubt regarding its import was dispelled by the testimony adduced in this Court in connection with Keene's motion for injunctive relief. Keene's obligation to pay the final judgment creditors by December 31, 1993, was absolute, and was motivated by tax considerations. It was not dependent upon Keene's receipt of an NOL refund, and more-

---

**3.** On June 16, 1993, Keene had sought a temporary restraining order which Judge Weinstein granted on June 18, 1993. With certain exceptions, the temporary restraining order stayed all pending actions against Keene, and also stayed the enforcement of any judgments obtained against Keene, including the enforcement of judgments against the appeal bonds or escrows, or the drawing of the proceeds of the standby letters of credit by the sureties.

over, payment was not limited to final judgments secured by appeal bonds or escrows. All final judgments were to be paid. Finally, it appears that Keene contemplated using the collateral securing the letters of credit and the funds held in escrow to discharge its final judgment obligations totalling nearly $29 million.

### E. The Decision of the Second Circuit and Its Aftermath

In its decision dated December 1, 1993, the United States Court of Appeals vacated the District Court's July 1, 1993 preliminary injunction, and ordered that the complaint be dismissed for lack of subject matter jurisdiction. Finding that Keene's complaint was an attempt to readjust creditors' rights outside of the Bankruptcy Code, the Court of Appeals concluded that there was no substantive right to compel creditors to settle, and hence, no case or controversy.[4]

On December 2, 1993, Keene filed its petition for rehearing and stay with a suggestion for rehearing *en banc*. Taking the position that this filing stayed the mandate of the Court of Appeals pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure, Keene immediately advised its sureties, the banks that issued the standby letters of credit and the attorneys for certain judgment creditors that payment on any bonds or letters of credit would violate that stay and be actionable.

At or about that same time, St. Paul presented Continental Bank with letters of credit aggregating approximately $21.3 million, including letters of credit backing bonds where the underlying appeals were not final, had been reversed in Keene's favor, or had been satisfied by Keene. Further, attorneys for some of the final judgment creditors whose judgments had been stayed, first by

the posting of the escrows and then by the July 1, 1993 injunction, demanded payment from the escrow agent.

Against this background, Keene filed its Chapter 11 petition on December 3, 1993.

### DISCUSSION

#### A. The Automatic Stay

The filing of Keene's Chapter 11 petition triggers the automatic stay. 11 U.S.C. § 362. The automatic stay provides broad protection to Keene, preventing the commencement or continuation of litigation against Keene on account of pre-petition claims, 11 U.S.C. § 362(a)(1), preventing the enforcement of judgments based on pre-petition claims against the debtor or property of the estate, 11 U.S.C. § 362(a)(2), and preventing any act to obtain possession or control of property of the estate. 11 U.S.C. § 362(a)(3).

The automatic stay insulates the debtor and its property, and provides Keene with much of the immediate protection that it seeks from on-going asbestos-related litigation. For example, none of the judgment creditors can enforce their judgments against Keene's property. Further, those banks that have issued letters of credit to back the appeal bonds cannot enforce their rights against the Keene collateral that secures Keene's reimbursement obligation. *In re M.J. Sales & Distributing Co.*, 25 B.R. 608, 615 (Bankr.S.D.N.Y.1982).

In addition, the automatic stay prevents the adverse, non-final judgments from becoming final, thereby triggering the judgment creditor's right to payment from the surety or the escrow agent. Whether an action is "against the debtor" is determined

---

4. The creditors holding final judgments in this case place great emphasis on a statement in the opinion of the Court of Appeals that the supersedeas bonds and escrows securing final judgments are not Keene's assets. *Keene v. Fiorelli,* 14 F.3d 726, 732 (2d Cir.1993). This statement does not, however, foreclose consideration by this Court of whether these bonds or escrows are property of the estate. First, the statement in the opinion of the Court of Appeals is *dicta;* the Court vacated

the District Court's preliminary injunction and dismissed the complaint for lack of subject matter jurisdiction. Its statement regarding Keene's property interests in the supersedeas bonds and escrows was not necessary to its determination. Second, the issue before this Court is whether the bonds and escrows are property of the debtor-in-possession's estate pursuant to Section 541 of the Bankruptcy Code. This issue was not and could not have been before the Court of Appeals.

by examining the proceeding at the time that it is initiated, and not by who has appealed; if the action was commenced against the debtor, the appeal is stayed even though the debtor is the appellant. *Commerzanstalt v. Telewide Systems, Inc.*, 790 F.2d 206, 207 (2d Cir.1986); *accord Borman v. Raymark Industries, Inc.*, 946 F.2d 1031, 1035 (3d Cir. 1991); *Sheldon v. Munford, Inc.*, 902 F.2d 7, 8–9 (7th Cir.1990); *Cathey v. Johns–Manville Sales Corp.*, 711 F.2d 60, 61–62 (6th Cir.1983). In short, any creditor holding a non-final judgment as of the petition date cannot obtain a final judgment or enforce his or her claim against property of the estate absent relief from the automatic stay.

■ The automatic stay does not, however, provide Keene with all of the protection that it seeks. It does not prevent final judgment creditors from enforcing their judgments against the appeal bonds. The debtor retains a reversionary interest in an appeal bond subject to divestiture if the debtor is unsuccessful once the appeal process has been completed. *In re Celotex Corp.*, 128 B.R. 478, 482 (Bankr.M.D.Fla.1991). If that appeal has been completed prior to the filing of the petition, and the debtor has been divested of its reversionary interest, the debtor does not have an interest in the bond that is property of the estate. *Edwards v. Armstrong World Industries, Inc.*, 6 F.3d 312, 316–17 (5th Cir.1993); *Willis v. Celotex Corp.*, 978 F.2d 146, 149 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993); *In re Celotex Corp.*, 128 B.R. at 482; *see M.J. Sales,* 25 B.R. at 612–13.

■ The same conclusion applies to the letters of credit which were issued by Keene's banks and which Keene collateralized with its own property. The surety can draw on the proceeds of the letter of credit if it pays the judgment or the judgment debtor makes a demand for payment. The letter of credit is an independent third party obligation, and the proceeds are not the debtor's property even if, as here, the letter of credit is secured by the debtor's property. *Willis v. Celotex Corp.*, 978 F.2d at 148 n. 3; *In re Ocana,* 151 B.R. 670, 672 (S.D.N.Y.1993) (Leval, J.); *M.J. Sales,* 25 B.R. at 613.

■ Finally, the escrows securing the New York judgments that are final are not property of the estate protected by the automatic stay. In reaching this conclusion, the Court does not rely on the language of the escrows which states that the escrows shall *not* be considered Keene's property for any purpose whatsoever. At a minimum, Keene retained a reversionary interest in the escrows which secured non-final judgments; if the judgments were ultimately reversed and Keene prevailed, it was entitled to the return of the escrow.

■ Nevertheless, any interest that Keene had in an escrow was divested once the judgment became final. Under New York law—which governs the subject escrows—a deposit will operate as an escrow if (1) an agreement exists as to the subject matter and delivery of the deposit; (2) the deposit is delivered to a third party depository conditioned upon the performance of an act or occurrence of an event; and (3) the grantor relinquishes control over the deposit. 55 N.Y.Jur.2d, Escrows § 3, at pp. 589–90 (1986).

The escrows created to secure the New York judgments satisfy these requirements. Keene and the judgment creditors agreed that Keene would deliver funds to a depository bank to secure payment of a final judgment. This agreement was intended to be a substitute for the supersedeas bond arrangement. Keene delivered the funds to the bank upon the condition that they would be paid to the judgment creditor to the extent his or her judgment became final, and would be paid to Keene, *inter alia,* if Keene prevailed on appeal or paid the judgment out of other funds. Upon delivery, Keene relinquished control over the deposit except for certain limited purposes, such as investment decisions.

■ Under New York law, the delivery of a fund of money into escrow (i) creates an equitable interest in favor of the grantee and (ii) places the funds beyond the reach of the grantor's creditors. *In re O.P.M. Leasing Services, Inc.*, 46 B.R. 661, 666–67 (Bankr. S.D.N.Y.1985). The grantor retains bare le-

gal title until the contingency occurs, at which point it is divested of even this limited interest:

Thus, the general rule in New York regarding escrow accounts is that unless the judgment debtor, as grantor, retains an interest in the escrowed property over and above the interest of the grantee, the escrow account cannot be reached by the debtor's judgment creditors. *See Jamaica Savings Bank v. Lefkowitz*, 390 F.Supp. 1357, 1363 (E.D.N.Y.), *aff'd*, 423 U.S. 802, 96 S.Ct. 10, 46 L.Ed.2d 23 (1975); *Creel v. Birmingham Trust National Bank*, 383 F.Supp. 871, 879 (N.D.Ala.1974), *aff'd*, 510 F.2d 1363 (5th Cir.1975); *In re Simon*, 167 F.Supp. 214, 215 (E.D.N.Y.1958); *In re Treiling*, 21 B.R. 940, 943 (Bankr.E.D.N.Y. 1982); *Valerio v. College Point Savings Bank*, 48 Misc.2d 91, 92, 264 N.Y.S.2d 343, 344 (Sup.Ct. Suffolk Co.1965). . . .

It is true that under New York law legal title to property placed in escrow remains with the grantor until the occurrence of the condition specified in the escrow agreement. *See Press v. Marvalan Industries, Inc.*, 422 F.Supp. 346, 349 (S.D.N.Y.1976); *In re Ellison Associates*, 13 B.R. 661, 670 (Bankr.S.D.N.Y.1981); *Stanton v. Miller*, 58 N.Y. 192, 201 (1874); *Alexander v. Quality Leather Goods Corp.*, 150 Misc. 577, 579–580, 269 N.Y.S. 499, 502 (Sup.Ct., N.Y.Co.1934). However, it is equally true that the deposit of property placed in escrow creates in the grantee such an equitable interest in the property that upon full performance of the conditions according to the escrow agreement, title will vest at once in him. Hence, although pending full performance of the conditions, the legal title remains in the grantor and is subject to . . . the lien of a judgment against him to the extent of his interest therein, it has been held that such lien, obtained with notice of the escrow agreement, is subject to the equity of the grantee. 28 Am.Jur.2d Escrow § 10 (1964). *See also May v. Emerson*, 52 Or. 262, 96 P. 454, 455 (Or.1908).

46 B.R. at 667. *Cf. In re Ocana*, 151 B.R. at 673–71 (where debtor creates a trust to secure the claims of its insureds, the trust is not property of the estate, and the debtor retains a reversionary interest to the extent the trust property exceeds the purpose for which the trust was established.)

■ Once the contingency occurs, the grantor's legal title merges with the grantee's equitable title, and passes to the latter by operation of law. In the present case, Keene was divested of legal title in escrows securing judgments that became final prior to the filing of the petition. Divested of legal title, it had no further interest—legal or equitable—in the escrows, and hence, these escrows are not property of the estate.

■ Finally, the enforcement of the final judgments cannot be considered as actions against Keene within the meaning of 11 U.S.C. § 362(a)(1). The automatic stay is deemed to extend to actions against third parties where there is such an identity of interest between the debtor and the third party that "a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *A.H. Robins v. Piccinin (In re A.H. Robins )*, 788 F.2d 994, 999 (4th Cir.) *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986) (citing *In re Johns–Manville Corp.*, 26 B.R. 405, 410 (Bankr.S.D.N.Y.1983)); *accord Edwards v. Armstrong World Industries*, 6 F.3d at 316; *Solow v. PPI Enterprises (U.S.) Inc.*, 150 B.R. 9, 11 (S.D.N.Y.1992). "The obligations of a surety are sufficiently independent to provide the basis of an action by the judgment creditor to collect on the bond unfettered by the automatic stay provisions of the Bankruptcy Code." *Edwards v. Armstrong World Industries*, 6 F.3d at 317; *accord, Willis v. Celotex Corp.*, 978 F.2d at 149; *In re Johns–Manville Corp.*, 26 B.R. at 431 ("[T]he interests of these insurers and sureties are not sufficiently interwoven with those of the debtor to comport with the narrow scope of Section 362 of the Code."). The enforcement of these claims against the sureties and escrow agents, based on independent contractual obligations whose resolutions do not involve Keene's employees and management, does not constitute an action against Keene. *Willis v. Celotex*, 978 F.2d at 148–49; *Washburn & Kemp, P.C. v. Committee of Dalkon Shield Claimants, (In re A.H. Robins Co.)*, 846 F.2d 267, 271 (4th Cir.1988).

## B. Preliminary Injunction Motion

### 1. Introduction

The Court will now turn to the more difficult issue raised by Keene's motion: under 11 U.S.C. Section 105(a), does the Court have the power to enjoin enforcement of the final judgments against the appeal bonds and escrows, and prevent the sureties from drawing the proceeds of the letters of credit? Section 105(a) empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." It is a broad grant of power which exceeds the limits of the automatic stay, and empowers the Court to "use its equitable powers to assure the orderly conduct of the reorganization proceedings." *In re Neuman*, 71 B.R. 567, 571 (S.D.N.Y.1987) (quoting *In re Baldwin–United Corp. Litigation*, 765 F.2d 343, 348 (2d Cir.1985)) (citing *In re Johns–Manville Corp.*, 40 B.R. 219 (S.D.N.Y.1984)).

Preliminary injunctive relief is governed by Bankruptcy Rule 7065 which incorporates Fed.R.Civ.P. Rule 65. *Feit v. Drexler (In re Feit & Drexler, Inc.)*, 760 F.2d 406, 415 (2d Cir.1985). Ordinarily, the party requesting the preliminary relief must:

> demonstrate both irreparable harm and a likelihood of success going to the merits or a sufficiently serious question regarding the merits to make it a fair ground for litigation with the balance of hardship tipping decidedly in its favor.

*Accord Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 972 (2d Cir.1989) (citing *Fireman's Fund Ins. Co. v. Leslie and Elliott Co., Inc.*, 867 F.2d 150 (2d Cir. 1989) (per curiam)).

■ Under Section 105, however, a debtor need not show irreparable harm. *In re Neuman*, 71 B.R. at 571; *C & J Clark America, Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*, 92 B.R. 87, 92 (Bankr.S.D.N.Y. 1988). Rather, the Court can enjoin an activity that threatens the reorganization process or impairs the court's jurisdiction with respect to a case before it. *Alert Holdings, Inc. v. Interstate Protective Services, Inc.*, 148 B.R. 194, 200 (Bankr.S.D.N.Y.) (citing *LTV Steel Company, Inc. v. Bd. of Educ. (In re Chateaugay Corp., Reomar, Inc.)*, 93 B.R. 26, 29 (S.D.N.Y.1988)).

Keene has proffered several grounds for injunctive relief. These include (1) interference with the orderly reorganization process through undermining the plan foundation contained in the pre-petition settlement, piecemeal dissipation of Keene's assets and diversion of Keene's management, employees and resources (2) elevation of contingent judgment claims to secured reimbursement claims and (3) prevention of full recovery on claims which should be subordinated or disallowed. The Court will address these seriatim.

### 2. Interference with the Reorganization Process

■ The Court finds from the credible evidence that Keene has failed to demonstrate that the enforcement activities which it challenges will interfere with the reorganization. Keene is an unusual debtor-in-possession; its sole pre-petition business involved managing its asbestos-related litigation, and the automatic stay has stopped that litigation in its tracks. This is not a debtor faced with the challenge of carrying on a business while trying to formulate a plan. It has no business to carry on.

Keene has also failed to demonstrate how the failure to grant an injunction will undermine the settlement in principle or the plan, or cause the piecemeal dissipation of its assets. To the contrary, enforcement of the final judgments is wholly consistent with the settlement in principle. Under the terms of the settlement, Keene was required to pay all final judgment creditors by December 31, 1993; permitting the final judgment creditors to execute against non-debtor property is consistent with this goal, and does not dissipate property of the estate. Further, Keene apparently contemplated payment from the very property it now seeks to shield.

Moreover, this does not preclude Keene from consummating the balance of the settlement in principle with its remaining creditors as part of the reorganization. Under the settlement in principle, Keene and the repre-

sentatives of the other four classes of creditors agreed to carve out the final judgment creditors, pay them in full, and then deal with the claims of the other four classes. Keene has failed to articulate, much less show, why it cannot use the settlement as a foundation for a plan involving creditors in the remaining four classes or reach the same agreement with the remaining creditors that it reached pre-petition.

Finally, Keene has failed to demonstrate that permitting enforcement will divert its management, employees and resources. As noted, the filing of the petition has freed them from their daily tasks of managing on-going litigation. In the case of the enforcement of final judgments against appeal bonds, there is little for Keene to do. The evidence showed that the judgment creditor provides the necessary information to the surety who, at some point, makes a demand on the letter of credit. None of this requires Keene's involvement.

Although Keene has more direct involvement in connection with the payments out of the escrows, Keene has failed to show that it is so time consuming and disruptive as to warrant injunctive relief. Keene must calculate the amount that has to be paid, including interest, and take whatever steps are necessary to release funds from the appropriate escrows. While it is important to ensure that the correct amounts are paid, the task appears neither time consuming nor overly involved.

### 3. Elevation of claims

■ According to Keene, the enforcement of the final judgments, at least in the case against surety bonds, will elevate the judgment claims from contingent to secured. If the surety satisfies the judgment and draws the proceeds of the letter of credit, the bank issuing the letter of credit will hold a liquidated reimbursement claim against Keene. This claim is secured by Keene's property.

This argument misperceives the nature of the final judgment creditors' claims, and exalts form over substance. Keene "elevated" these claims when, prior to bankruptcy, it elected to appeal adverse judgments, and

post appeal bonds to avoid the disruption of collection activity. *See In re Johns–Manville Corp.*, 26 B.R. at 433. Having done so, Keene created in favor of these creditors rights greater than those enjoyed by the general creditor body, and those rights became liquidated, fixed and non-contingent once the underlying judgments became final. Payment of these claims by the sureties and the ultimate creation of non-contingent secured reimbursement claims have no practical effect, therefore, on this estate or its creditors.

### 4. Disallowance or Subordination of the Underlying Judgment

■ The most serious argument which Keene makes in favor of injunctive relief concerns the possible disallowance or subordination of all or some portion of the final judgment claims. Keene raises several points. It vociferously contends that asbestos-related litigation is unfair and results in inequitable judgments that this Court should remedy under its general equitable powers, and that components of the final judgments—particularly punitive damages and "delay" damages—can or should be disallowed or subordinated. If so, argues Keene, the final judgment creditors should be prevented from enforcing their claims against the sureties and escrows.

Similar concerns under analogous circumstances led to the issuance of injunctive relief in the bankruptcy of Celotex Corporation, another asbestos producer. At the time of its filing in October, 1990, Celotex was a defendant in over 141,000 asbestos-related personal injury actions, and Celotex had posted supersedeas bonds totalling nearly $70 million. *Willis v. Celotex Corporation*, 978 F.2d at 149. The bonds were secured by letters of credit issued by First Florida Bank, N.A., which, in turn, were secured by certificates of deposit pledged by Celotex. *Id.* at 147–48.

At the inception of the bankruptcy, the Celotex court issued an injunction that, *inter alia*, prevented the judgment creditors from proceeding against the supersedeas bonds. *In re Celotex Corp.*, 128 B.R. at 482. In-

stead, the Court sought to require each final judgment creditor to seek relief from the Section 105 injunction to enable the Court to review the final judgment, for certain limited purposes, on a case-by-case basis:

> As to the utilization of Section 105 vis-a-vis the supersedeas bonds, once the judgment creditor has been successful throughout the appellate process, the judgment creditor is not able to proceed against the supersedeas bond without seeking to vacate the Section 105 stay in this Court. Under these circumstances, it will be Debtor's burden to establish that the Section 105 stay should continue. The Court's inquiry will include Debtor's ability to avoid any final judgment under the Bankruptcy Code and the necessity to protect its sureties or disenfranchise them if such surety agreements can be considered executory contracts or avoided under the avoiding powers in the Bankruptcy Code. (11 U.S.C. §§ 365, 547, and 548.) Additionally, consideration will be given to Debtor's ability to deal with the targeted litigation within the reorganization plan and the effect on that process if the Section 105 stay is extinguished. The analysis may also include the treatment of those judgments which include punitive damages or joint and several liability or contribution with other asbestos co-defendants. This Court does not seek to establish an exhaustive list of inquiry, as each specter of the Section 105 stay may relate differently to an aspect of Debtor's reorganization process which seeks to be protected.

128 B.R. at 484 (footnote omitted).

Whatever merit this approach has as a case management technique, this Court declines to follow it. Keene has failed to identify any legal basis which would prevent final judgment creditors from enforcing their entire judgments against third party sureties or non-estate property held by escrow agents, or prevent the sureties from drawing on the letters of credit.[5] If these rights cannot be denied, they should not be delayed.

■■■■ It is axiomatic that Keene cannot collaterally attack the *amount* of the final judgments in this Court. Section 1738 of Title 28 of the United States Code mandates that every United States Court give full faith and credit to the "acts, records and judicial proceedings" of any state, territory or possession to the same extent they have in their own courts. Section 1738 applies to Bankruptcy Courts, and absent fraud in the procurement of a default judgment, "[b]ankruptcy proceedings may not be used to re-litigate issues already resolved in a court of competent jurisdiction." *Kelleran v. Andrijevic*, 825 F.2d 692, 695 (2d Cir.1987). Under the doctrines of res judicata and collateral estoppel—which also apply to federal court judgments—the later court cannot alter the results of a prior final judgment even if that judgment was wrong. *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981).

Keene does not argue that the courts that rendered the final judgments at issue lacked jurisdiction to do so or that under local law, the final judgment creditor cannot enforce the judgment against the appeal bond or escrow. Nor does Keene allege fraud in the procurement of the judgment. Instead, Keene launches an attack against the tort system, arguing that it unfairly causes inflated verdicts and judgments which frequently have little relationship to actual injury.

It is unnecessary for this Court to review Keene's criticisms of the tort system, however meritorious or compelling one might find them. The final judgments at issue were rendered by courts of competent jurisdiction, and have been upheld on appeal. This Court cannot and will not revisit the damage awards to determine if they are excessive or the product of an inequitable system.

■■■■ Keene's challenge concerning punitive damages raises a different issue.[6]

---

5. Keene has failed to show that it could avoid the transfer of its collateral to secure the letters of credit as preferences. The pledge of collateral as well as the establishment of the escrows occurred more than ninety days prior to the filing of the petition.

6. Keene also challenges enforcement of the final judgments to the extent that they will be paid to attorneys under contingency fee arrangements or to the extent they include "delay damages". Given the Court's determination regarding the puni-

Keene correctly argues that a Bankruptcy Court can subordinate, disallow or limit punitive damage claims. *In re Johns–Manville Corp.*, 68 B.R. 618, 627 (Bankr.S.D.N.Y.1986), *aff'd,* 78 B.R. 407 (S.D.N.Y.1987). Further, the preclusive effect of a final judgment would not bar consideration of this argument if the judgment creditor asserted the judgment as a claim against the estate. *See Pepper v. Litton,* 308 U.S. 295, 305–06, 60 S.Ct. 238, 244–45, 84 L.Ed. 281 (1939).

It does not follow, however, that a court of equity can prevent the judgment creditor from enforcing its disallowed or subordinated punitive damage award against the surety or escrow. Such a result ignores 11 U.S.C. § 524(e) which provides:

> Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

■ Although Section 524(e) speaks in terms of "discharge", its scope is greater. The "import" of this provision is that "the mechanics of administering bankruptcy, no matter how suggestive, do not operate as a private contract to relieve co-debtors of the bankrupt of their liabilities." *Union Carbide Corp. v. Newboles,* 686 F.2d 593, 595 (7th Cir.1982) (per curiam) (construing Section 16 of the 1898 Bankruptcy Act, the predecessor to Section 524(e)).

In light of Section 524(e), Courts have declined to permit guarantors to invoke claim limitations existing under other subparagraphs of Section 502(b). In *Stoller's Inc. v. Peoples Trust Bank, (In re Stoller's Inc.),* 93 B.R. 628 (Bankr.N.D.Ind.1988), a secured creditor sought to recover its claims, including post-petition interest and attorneys fees, from the debtor and non-debtor guarantors. Section 502(b)(2) precludes allowance of post-petition interest, and Section 506(b) creates an exception if the creditor is oversecured.

Although the Court concluded that the creditor was not oversecured, and hence, that its claim for post-petition interest could not be allowed against the debtor, 93 B.R. at 635, the Court nonetheless held, in light of Section 524(e), that the claims for post-petition interest as well as the contractual right to attorneys fees could be asserted against the guarantors:

> Summit Bank further argues that it is entitled to post-petition interest and attorney's fees from Mr. and Mrs. Stoller as guarantors of the debtor's note, since their obligation is not abated by these bankruptcy proceedings. 11 U.S.C. § 524(e), while not directly addressing this question, sheds light on the effect of a debtor's bankruptcy upon co-debtors and guarantors. The section states that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." As the legislative history explains, "[s]ubsection [e] provides the discharge of the debtor does not affect co-debtors or guarantors." S.Rept. No. 95–989 to accompany S. 2266, 95th Const., 2d Sess. 80–81 (1978), U.S.Cong. & Admin.News p. 5787, 5867.
>
> In view of the import of this section, i.e., bankruptcy proceedings do not affect the liabilities of co-debtors and guarantors, the court agrees Mr. and Mrs. Stoller's independent obligation to Summit Bank is not affected by the debtor's bankruptcy.... The court therefore determines that Mr. and Mrs. Stoller are liable for post-petition interest and attorneys' fees as allowed by the terms of their guarantee.

*Id.* at 635–36 (citations omitted).

Just as Section 524(e) prevents a guarantor from escaping liability for interest that is not allowable against the debtor-principal obligor under Section 502(b)(2), it prevents sureties and escrow agents from avoiding liability to final judgment creditors for claims that might otherwise be disallowed or subordinated if asserted against Keene's estate.

Further, any inequity in this result is the product of Keene's election to post appeal bonds before filing for bankruptcy. In *Johns–Manville,* certain judgment creditors sought relief from the automatic stay to authorize the debtor to prosecute its appeal to finality. The underlying judgments contained punitive damage components, and the

tive damages, it is unnecessary to separately consider these arguments.

entire judgments were bonded by sureties. Granting relief from the automatic stay, Judge Lifland rejected the notion that he could or should prevent the creditors from enforcing their punitive damage awards against the sureties in the event they ultimately prevailed:

> The debtor further argues that this Court must deny these plaintiffs relief from the automatic stay because their claims based upon judgments awarded both compensatory and punitive damages could be converted by a surety into ones for contractual indemnification. Manville asserts that it is unfair for it to have to pay a surety for both compensatory and punitive damages when, pursuant to the Code, it may subordinate punitive damages claims. See 11 U.S.C. 726.
>
> However, this possibly inequitable result does not pertain to the criteria for lifting the automatic stay herein. Manville must bear the risk of this inequity as a risk of having filed in Chapter 11 after posting supersedeas bonds pending appeal. The issue as to whether the surety's potential claim is contractual or partially subordinate as punitive is not presently before the Court. Appellee plaintiffs' risks were eliminated when the debtor procured these bonds. The bonds served to protect these plaintiffs from the debtor's failure to pay these judgments for any reason, including bankruptcy. See In re Fintel, 10 B.R. 50, 52 (Bankr.D.Oreg.1981).

26 B.R. at 433.

Judge Lifland's observations apply with equal force to this case. As previously stated, Keene "elevated" the final judgment claims when it procured bonds or escrows. This removed the risk of Keene's insolvency and bankruptcy. This Court will not disturb this reallocation of that risk.

Keene has cited only one case which actually prevented a final judgment creditor from enforcing the punitive damage component against a surety. In *Gnidovec v. Alwan (In re Alwan Brothers Co.)*, 105 B.R. 886 (Bankr. C.D.Ill.1989), the plaintiffs (the "movants") had obtained a pre-petition state court judgment against the debtors. The judgment consisted of $110,059.00 in compensatory damages and $750,000.00 in punitive damages, plus costs and interest. The debtors appealed the judgment, and the parties entered into a Supersedeas Bond Trust Agreement which was approved by the state trial court. Under the agreement, the debtors transferred certain real estate to a trustee. Upon the entry of an adverse final judgment, the debtors had thirty days to pay it; if they did not, the trustee was authorized to sell the real estate and use the proceeds to satisfy the judgment.

After the appeals were affirmed and the judgments became final, the debtors filed their Chapter 11 petitions. In the course of subsequent bankruptcy court litigation, the Court concluded that the parties' agreement was the equivalent of a supersedeas bond, and that "so much of the real estate which is the subject of the Agreement that is necessary to satisfy the Movant's claims is not property of the bankruptcy estate over which this Court has jurisdiction." *Id.* at 895.

The Court nevertheless held that the intervention of bankruptcy subjected the movants' claim to the jurisdiction of the Bankruptcy Court. Having determined that the punitive damage portion of the judgment was dischargeable, the Court concluded that the movants could only satisfy the compensatory portion of their judgment together with costs and interest against the trust, and that the balance of the trust reverted to the estate. *Id.*

In a subsequent decision on the movants' motion for reconsideration, the Bankruptcy Court amplified its reasoning:

> This Court's ruling that so much of the real estate which is necessary to satisfy the MOVANTS' claims for compensatory damages should be sold was premised upon a determination that the ALWANS' bankruptcy filing did in fact require alteration of the terms of the Supersedeas Bond Trust Agreement. In this Court's view, this result serves the purpose of the SUPERSEDEAS bond in that the real estate is appropriated to the benefit of the MOVANTS to make them whole while according the status of PUNITIVE DAMAGES its proper place in a bankruptcy proceed-

ing.... Unlike the typical supersedeas bond which is not property of the estate and cannot be used to fund a plan of reorganization, the property which is the subject of the Supersedeas Bond Trust Agreement is nine parcels of real estate. It is those properties which now remain that the ALWANS seek to reorganize.

*In re Alwan Brothers Co.,* 112 B.R. 294, 296–97 (Bankr.C.D.Ill.1990).

Although the trust agreement in *Alwan* is similar to the escrow agreements at issue, this Court declines to follow the *Alwan* reasoning because it is logically inconsistent and contravened by case law in this district. The debtors' interest in the trust was always subject to the equities created in the judgment creditors' favor, and of little value to their other creditors. *In re O.P.M. Leasing,* 46 B.R. at 667. Further, once the Court ruled that the trust was not property of the estate, the filing of the petition could not drag it back in. The debtors' reversionary interest had been extinguished and the final judgment creditors should have been free to pursue their judgments against non-estate property.

The *Alwan* decision is also inconsistent with the case law already discussed. In *Johns–Manville,* the Court noted that the procurement of the supersedeas bond reallocated the risk of the debtor's insolvency and bankruptcy. If inequities resulted, they flowed from the posting of the bond before the filing of the Chapter 11 petition. The *Alwan* court chose to ignore these temporal distinctions, finding that the purpose of the bond was to preserve the status quo, and that the debtors could have filed their petitions earlier without posting any bond and at a time when they were just as insolvent. Hence, the judgment creditors did not suffer damages as a result of the delay in executing the judgment.

The final judgment creditors, however, are not required to prove delay damages to enforce their rights. That Keene could have filed a Chapter 11 at an earlier time is beside the point; it didn't. It is equally true that Keene could have paid these judgments—or these judgment creditors could have enforced them against Keene's assets—long before the bankruptcy was filed. Many things could have occurred to change the outcome of this proceeding, but what actually occurred must dictate the result.

## CONCLUSION

The automatic stay prevents the continuation of asbestos-related litigation against Keene, including pending appeals by Keene, prevents Keene's banks from seizing the collateral backing the letters of credit and prevents any judgment creditor from satisfying the judgment against property of the estate. The automatic stay does not prevent, and this Court will not stay, final judgment creditors from enforcing their judgments against the appeal bonds or escrows, or the sureties from drawing the proceeds of the letters of credit in accordance with their terms.

The foregoing shall constitute the Court's findings of fact and conclusions of law. Fed. R.Civ.P. 52(a), made applicable by Fed. R.Bankr.P. 7052.

Settle an order on five days notice consistent with this decision.

IT IS SO ORDERED.