THE FIDELITY AND CASUALTY COMPANY OF NEW YORK, Plaintiff, *v.* THE FARMERS NATIONAL BANK OF HUDSON, NEW YORK, Defendant.

Supreme Court, Trial Term, Columbia County, March 28, 1936.

Ainsworth & Sullivan [*Charles B. Sullivan* and *Warner M. Bouck* of counsel], for the plaintiff.

*Hawver & Hawver* [*Robert E. Whalen* of counsel], for the defendant.

FOSTER, J. The plaintiff herein was surety on the official bonds of Charles J. West, former treasurer of the city of Hudson. This action is brought against the defendant bank, as the depository of city funds, to recover certain moneys misappropriated by West, and which, it is alleged, were wrongfully paid over by the defendant to him.

The latter held office from January 1, 1920, to December 30, 1931. The plaintiff was his surety for the four terms embraced within this period. Between 1923 and 1931 he misappropriated from city funds the sum of $266,965.22. The city was reimbursed by the plaintiff to the extent of $223,362.19; and the latter received an assignment of any and all rights which the city may have had against the defendant and others. A demand was made upon the bank by the plaintiff for moneys alleged to have been wrongfully paid over, and thereafter on July 29, 1933, this action was commenced. The complaint demands the sum of $73,342.86, but the plaintiff does not claim that the proof sustains the action for that amount, and asks judgment for the lesser sum of $58,415.51, with interest on certain items.

Three separate causes of action are set forth in the complaint, each relating to different periods of time. The first deals with acts alleged to have been committed between May 1, 1923, and April 30, 1926; the second with the period from May 1, 1926, to April 30, 1929; and the third with the period between May 1, 1929, and May 2, 1930. Aside from formal allegations the gravamen of each cause of action is the same, and substantially as follows: That in violation of its depository agreement, and the provisions of the city charter, the defendant permitted West to withdraw moneys on orders which he alone signed; that it also issued to him non-interest bearing certificates of deposit in exchange for city moneys, in breach of its obligation to pay interest on daily balances; that the defendant wrongfully profited thereby, and also that it

knowingly aided and abetted West by issuing such certificates to conceal his thefts of cash from current cash collections, and to convert the proceeds of a number of such certificates to his own personal use.

During the course of his astounding peculations West apparently used several methods, but this case presents only claims under two forms of diversion. Under these claims plaintiff seeks to recover specific amounts converted from cemetery trust or interest accounts in the total sum of $37,776.93. West withdrew these funds upon checks or orders signed by himself alone, as city treasurer, and appropriated the proceeds. The sum of $21,883.53 represents certificates of deposit purchased by him with city funds, presumably tax moneys, and later cashed by him or deposited in his own personal account. What ultimately became of these proceeds is not revealed by the record. His personal vouchers are not in evidence, and the ledger sheets of the bank merely show the amounts and dates of withdrawals from his personal account. None of the moneys withdrawn by either method were used to pay any personal debt West may have owed to the bank.

Apparently one item of $1,500 is included in both claims, and this duplication requires a subtraction of that amount in order to arrive at the correct amount for which recovery is sought. An item in the sum of $255.80, representing interest claimed to have been lost to the city by the issuance of certificates of deposit, completes the total.

The test of plaintiff's case rests very largely upon the relationship which existed between the city and the defendant, and the obligation inherent therein. Such relationship was established in conformity with the requirements of section 152 of the city charter (Laws of 1921, chap. 669). The common council advertised for sealed proposals from banks in the city to act as a depository for city funds. The advertisements are not included in the exhibits submitted, or referred to in the briefs, and it may, therefore, be assumed that the language thereof is of no particular significance. In each instance the agreement between the city and the defendant was created by the city's acceptance of the defendant's written bid. This bid was in the form of a letter, and in so far as it is germane to this case, offered to pay a definite rate of interest on total daily balances, and also to furnish a surety bond in the sum of $150,000. For the period from May 1, 1923, to April 30, 1926, defendant agreed to pay interest on the total daily balances standing to the credit of the city at the rate of three and eighty-six one-hundredths per cent, and at the rate of four and five one-hundredths per cent between May 1, 1926, and April 30, 1930.

Nothing was said about the form of deposits or the method by which the same might be withdrawn; but certain obligations, of course, were thereby implied. Thus, the bank was bound to faithfully keep such deposits and pay them out only in the manner authorized, either expressly or by implication. These obligations existed as a matter of law, irrespective of whether or not a bond was given. The plea that the depository agreements merged in the bonds is not sound. The limitation, contained in the latter, that would bar an action unless the same was brought within six months after the discovery of a default, did not change the obligation inherent in the depository agreements. This provision, and all other clauses of limitation, were clearly for the benefit of the surety as their language indicates. The liability of the bank was not thus to be diminished to the limits agreed upon by the surety.

Nor do I think that any part of the plaintiff's claim is barred by the Statute of Limitations. The depository relationship was continuous, and the accounts for the most part were carried as continuous open accounts until the defendant ceased to act. With no break in the depository relationship, a demand for payment was necessary, and the statute did not begin to run until such demand was made. (*Bank of British North America* v. *Merchants' Nat. Bank*, 91 N. Y. 106.)

However, liability cannot be fixed against the bank upon implications which the depository relationship does not fairly establish. The record does not disclose that any instructions were given to the bank either as to the accounts to be opened, or the method of withdrawals therefrom, except, of course, as it had contact with the city treasurer. In the absence of such instructions it is fair to assume that the bank was bound by the pertinent provisions of the city charter in so far as they may have covered the situation. It remains, therefore, to determine the extent and meaning of such provisions.

It was provided therein (§ 70) that the city treasurer should be the custodian of all city moneys, and that he should open and keep a separate account with each board, commission or officer for which public money was collected or appropriated; but the language of this section imposed no duty on the bank, nor did it serve as notice except as to the fact that the treasurer was to keep separate accounts within the city government.

The next section (71) provided that he should deposit all moneys held by him in such bank or trust company as should be designated by the common council. Neither this section, nor any other section of the charter, specified the form or forms in which such

deposits should be made. In the absence of such information it was reasonable to suppose that discretion was necessarily invested in someone to determine the number and form of accounts to be used. Under such circumstances the bank had a perfect right to assume, until the contrary appeared, that the chief fiscal officer of the city had such authority. The contrary never appeared.

It is plaintiff's contention that the issuance of certificates of deposit to West as city treasurer was, *ipso facto*, a violation of the charter. It seems to me that the issue on this phase of the case is scarcely so simple and clear cut as plaintiff urges. The bank had no precise mandate to guide it. The terms of the charter provisions are general, *i. e.*, " The city treasurer shall deposit all moneys held by him as city treasurer in such bank or trust company as shall be designated by the common council as city depository." (§ 71.) It may be said that such language required a general deposit to the credit of a general fund. Ordinarily any deposit whereby the relationship of debtor and creditor is established between a bank and a customer is a general deposit. (3 Michie Banks & Banking, p. 247.) A certificate of deposit, of course, creates such a relationship.

Moreover, it must be noted that the certificates issued to West were issued to him as city treasurer, and not to him personally. Under such circumstances, and in view of the language quoted above, it is hardly just to say that the bank violated a positive statutory duty when it issued such certificates. Nor can it be assumed that the bank was bound to know that such procedure would serve no legitimate function on the part of the official involved. With nothing in the charter, or in the ordinary concepts of banking practice, to give it power to dictate as to the form of deposits, the bank was under no duty to conduct an inquiry as to the allocation of funds when the same were presented for deposit. (*Sagone* v. *Mackey*, 225 N. Y. 594; *Allen* v. *Puritan Trust Co.*, 211 Mass. 409; 97 N. E. 916.) For aught that was apparent those prerogatives belonged to the city treasurer.

The plaintiff, taking the position of the city, as it does by subrogation, cannot now be heard to claim otherwise. If the charter was to bind the bank it was also equally binding on the city, and if the latter chose to rest on the general language thereof the bank had a right to act under it. The bank also had a right to assume that the monthly and annual reports of West as city treasurer would be presented to the common council. As a matter of fact they were, and, while false in many particulars, at least it is fair to assume that they gave notice he was maintaining at least five different accounts in the bank. In view of all this the latter had

no reason to assume that he did not possess authority to deposit money to the credit of the city in any form he chose, or to transfer funds from one account to another.

It is true that the bank was obliged to pay interest on total daily balances, but here it may be noted that neither the depository agreement nor any provision of the charter defined precisely the meaning of these terms. Ordinarily one would say it meant interest on the daily balance of all moneys deposited to the city's credit, but it is scarcely consistent to apply this construction to all accounts, since some of them were in the interest department, and apparently there with the knowledge and acquiescence of the city. Surely the bank was not expected to pay double interest. The defendant contends that the phrase had to do with checking accounts, but whatever construction is adopted the right of the bank, under the situation as it existed, to accept deposits in the form offered was not affected The conclusion must be drawn, therefore, that the bank violated no positive duty when it accepted deposits from West by the issuance of certificates to him as city treasurer.

Following the foregoing provisions the charter provides how the city treasurer may pay out moneys (§ 73). An alleged violation of this section forms the basis of one claim on the part of the plaintiff that the defendant knowingly aided West to make misappropriations by paying over to him moneys on his sole written orders. The evidence conclusively establishes that the defendant did honor and cash such orders. This procedure, the plaintiff claims, was a direct breach of the charter; and an act, the illegality of which the bank was bound to know. If this claim is well founded the bank is liable for stolen moneys thus withdrawn, because, on such a basis, the bank's violation of a positive mandate made possible the thefts; and in that sense, it directly aided the defaulter, whether it had actual knowledge of his intention or not. An examination of this charter provision is, therefore, of prime importance.

It provides: " The city treasurer shall pay out said moneys only upon drafts signed by the mayor and countersigned by the city clerk to pay audits and allowances by the common council, and by the officer or by the president of any board or commission entitled to draw the same and countersigned by its secretary, but no such draft shall be drawn by or in behalf of any such officer, commission or board except for the purpose of paying for services rendered or materials furnished to such officer, commission or board and after audit or allowance of the amount found to be due therefor by such officer, commission or board." (§ 73.)

A careful reading of this language indicates that it does not constitute a restriction on the depository. Indeed, it does not

relate to the depository at all. Moreover, it includes only drafts for services rendered and materials furnished, and as to them the treasurer shall not pay them until they have been audited and allowed by the proper officials.

The procedure thus prescribed covers only the period up to the time when the drafts are presented to the treasurer for payment. This interpretation is confirmed by further language of the section wherein it states: "The city treasurer shall prepare and furnish to the mayor and each officer, commission or board, who shall have on deposit with *him*, uniform form of draft to be used by each of the same  *  *  *  for the purpose of drawing funds from the city treasury." (§ 73.) The construction of this language cannot be justifiably strained to render the term " city treasurer " synonymous with the word " depository." The treasurer was the custodian of the public money, and it is in such capacity that he is referred to therein.

How he shall pay the drafts after they reach him the charter does not say. In the absence of such a specific direction he might honor them by his signature thereon; or he might pay them by check signed by himself alone (*City of Newburyport* v. *Spear*, 204 Mass. 146; 90 N. E. 522); or for that matter, by cash. Obviously, drafts as contemplated by this section were in the nature of warrants, and were so designated when used. The fact that such drafts or warrants were used many times is not at all conclusive on the question. They were doubtless more convenient in many transactions, and from those submitted in evidence I draw the inference that they were given for services rendered or materials furnished. They would not have been so convenient in the purchase of securities which the treasurer had power to buy. They furnish, I think, at the most merely evidence of a custom as to payment of claims.

The terms of section 153 of the charter, the essence of which is embodied in the bond signed by the plaintiff, are not inconsistent with this construction, although the section appears to be loosely drawn. Considering it alone, the casual reader might take it to mean that the bank was to pay all orders drawn upon the treasurer, when signed by the proper officials, irrespective of his action. Construed fairly, however, it appears to refer back to section 73, and simply means that the depository is to pay all drafts signed by the proper officials, which are honored by the city treasurer; but I fail to see how it has any more restrictive significance than that section. It does not clearly appear whether the bank paid such drafts upon the strength of the treasurer's signature alone, or whether it also relied upon the other signatures attached. The record does not disclose any signature cards of

city officials filed with the bank, or if so, I have overlooked them. If the bank had the obligation to pay out moneys only over the signature of three officials, at least two of which would be different many times, it would certainly want to definitely know those signatures and have them on record. It would appear from this that the city never contended for the construction now urged by the plaintiff.

It may be further noted that under the charter (§ 309), the treasurer had power to invest water supply funds in securities that savings banks might purchase. He also had the same power with relation to cemetery funds (§ 318). As to the latter funds he had the additional and express authority to sell any or all of such securities and reinvest the proceeds. Nowhere do I find in the charter that he was required, before exercising these functions, to use a draft or warrant, or that he was required to obtain the consent of any board, commission or officer. To be sure he was limited in original investments by the condition of the funds, *i. e.*, as to whether certain bonds had been paid, but this limitation imposed no duty on the bank unless it had actual notice of diversions. The bank agreed to act as a depository and not as a supervisor of city finances.

From these considerations I draw the conclusion that it was not illegal *per se* for the defendant to permit West to make withdrawals on his sole written orders as city treasurer. Even if it be assumed that the foregoing matters of interpretation are not correct, at least they are sufficiently plausible to bar the assumption that the sections quoted are so clear as to admit of but one meaning. Liability, based upon a charge of statutoty duty, cannot be justly predicated upon a statute that is not clear and explicit.

It now appears that the withdrawals West made from the cemetery accounts upon his signature alone were peculated by him, but there is no proof that the bank had knowledge that such was his purpose. He had authority to purchase securities, and no duty rested upon the bank to trace the proceeds of checks, drafts or otherwise, and determine whether he had actually made such purchases. Nor did it have the obligation to determine the identity of the indorsers on such of the orders and checks that were indorsed. A bank does not become liable for funds misappropriated by a fiduciary because it did not inquire whether he was applying the funds to the purposes of the trust. (*Bischoff* v. *Yorkville Bank,* 218 N. Y. 106; *Clarke* v. *Public National Bank & Trust Co.,* 259 id. 285.) This is so whether the trust funds are public or private. (*Town of Eastchester* v. *Mount Vernon Trust Co.,* 173 App. Div. 482.) Nor does a multiplicity of orders make any essential differ-

ence as to notice of conversion. In the case last cited, which deals with a town supervisor's accounts, it was held that if the form was proper it was immaterial how many checks were drawn.

It has already been indicated that the bank did not act unlawfully, or in violation of the depository agreement, when it issued certificates of deposit in the absence of instructions as to the manner deposits should be made. Some of these certificates were deposited in his own personal account, many went into the general fund, and others were cashed, but what ultimately became of the proceeds the record does not show. Lack of such proof leaves only the question of whether deposits to his personal account placed the defendant on notice.

The law appears to be well settled that a fiduciary may deposit trust funds to his individual account (*Bischoff* v. *Yorkville Bank, supra; Clarke* v. *Public National Bank & Trust Co., supra; Whiting* v. *Hudson Trust Co.*, 234 N. Y. 394); and that is apparently so where the trust account and the personal account are in the same bank. (*Fidelity & Deposit Co.* v. *Queens County Trust Co.*, 226 N. Y. 225; *Goodwin* v. *American National Bank,* 48 Conn. 550.) Unless additional circumstances appear the bank is not charged with notice of intended conversion, and has a right to presume that the fiduciary will apply the funds to their proper purposes under the trust. Actual knowledge of West's diversions is not shown to have existed on the part of the bank. No personal obligation on the part of West to the bank was paid by any of the funds peculated. The bank did not participate in any profit by the transactions attacked except in the matter of interest lost to the city by the issuance of certificates of deposit, but the issuance of these was not unlawful and, therefore, the so-called profit rule cannot be justly applied on that score. There was one instance when the bank permitted West to transfer funds on an order signed by him without the designation " city treasurer " after his name. While the bank was undoubtedly careless in that regard, an isolated act of that character is not controlling, especially where it is shown that the major portion of the funds was merely transferred from one account to another. An inquiry, it is fair to assume, would only have resulted in adding the missing designation to the signature.

It is difficult to see how the bank can be charged with actual or constructive notice by way of additional circumstances, unless it be held that it was the duty of the bank to supervise the city's accounts; to conduct an inquiry when funds from one account were transferred to another, and also to conduct an inquiry when any particular account appeared to be in danger of depletion;

and further to concern itself generally with the financial condition of the city so as to know within reasonable limits the amounts that ought to be on credit to various accounts. This statement carries its own refutation. Neither the law nor any concept of banking practice imposes any one of these duties on any bank with relation to trust funds or otherwise, unless by special agreement in terms far more explicit than those shown here.

On the general situation as disclosed let it be noted that carelessness on the part of the city authorities existed in a high degree. If more than the slightest examination of West's accounts had been made during the long period he was engaged in peculations discovery would have been certain. If he had been asked to produce the securities intrusted to his care, or those he was authorized to purchase, discovery was equally certain. Those who had the obligation to do those things trusted him so implicitly that they violated their own duty under the charter. Over a short period of time perhaps this may be considered to have been without significance, but over a period of eight years the bank certainly had a right to assume that the city authorities were performing their functions properly, and the passage of time must have served to heighten the impression that West's withdrawals were being made in conformity with his trust. Under such circumstances and without the violation of a positive duty being shown, even if negligence in other respects is assumed, estoppel may well apply.

But, irrespective of these considerations, if the foregoing views are correct they are decisive, and there is no need to discuss the other points raised by counsel. The claims covered embrace the essential elements of the plaintiff's case, and the plaintiff, in my opinion, has failed to establish such elements as a matter of fact or law.

Findings may be made in accordance herewith, and the defendant may have judgment dismissing the complaint, with costs.

During the course of the trial objection was made to the receipt in evidence of the report of the Comptroller by his examiners. Decision was reserved. The objection is overruled and the report received. Plaintiff may have an exception.

Defendant's objections to the receipt of plaintiff's Exhibits 73 and 80 are overruled. Defendant may have an exception.

Plaintiff's motion to amend complaint to conform to the proof is granted.