*540 OPINION OF THE COURT
Walter M. Schackman, J.
Motion numbers 22 and 106 of the February 3, 1994 calendar are consolidated for decision.
The question presented in the motions is whether defendants in their capacity as escrow agents are liable to plaintiff for the dissipation of funds claimed to have been placed in escrow.
Plaintiff moves pursuant to CPLR 3212 for an order granting summary judgment on its first and second causes of action and awarding it $1.2 million in damages. Defendants cross-move pursuant to CPLR 3212 for an order granting summary judgment dismissing the complaint. By separate motion brought by order to show cause plaintiff moves pursuant to CPLR 6301 for an order preliminarily enjoining defendants from taking any action that will diminish, prejudice or impair plaintiff’s right to certain escrow held by defendants and requiring them to deposit in court the sum of $1.2 million with interest.

Parties

Plaintiff, National Union Fire Insurance Company of Pittsburgh, Pennsylvania, is a Pennsylvania insurance corporation authorized to conduct business in this State, e.g., the issuing of appeal bonds on behalf of a party appealing a judgment entered against it. Plaintiff maintains offices in New York, New York.
Defendant Proskauer Rose Goetz & Mendelsohn is a New York law partnership with offices in New York, New York (the law firm). Defendant Dale A. Schreiber (Schreiber) is an attorney licensed to practice law and is a partner of the law firm.

Preliminary Background

In February 1991 the Circuit Court of Cook County, Illinois, entered an order and judgment in the amount of $767,986.86 against Towers Financial Corp. (TFC), and in favor of F.H. Prince & Co. (Prince) (Prince & Co. v Towers Fin. Corp., No. 89 L 15714). A further order and judgment for attorneys’ fees *541 and costs dated April 4, 1991, in the amount of $60,967.39, was also entered against TFC.
On or about May 10, 1991, in consideration of plaintiff’s agreement to issue an appeal bond (the appeal bond) on behalf of TFC and in favor of Prince, the defendants law firm and Schreiber notified plaintiff that TFC executed an escrow agreement wherein TFC agreed to indemnify plaintiff against any loss it might incur as a consequence of issuing the appeal bond. To secure this obligation, TFC agreed to deposit collateral, i.e., certificate(s) of deposit, in the amount of $1.2 million, in escrow with the law firm (the application letter).
In the application letter dated May 10, 1993 (discussed infra), the law firm acknowledged it had entered an escrow agreement (the escrow agreement, discussed infra), with TFC whereby the former undertook the obligations of escrow agent with respect to the subject certificate(s) of deposit and that the law firm would hold and eventually deliver the collateral to plaintiff in conformity with the terms of the application letter and escrow agreement. In reliance upon the application letter, plaintiff posted appeal bond No. 10-12-52, in the sum of $1.2 million, to secure the Prince judgment that is presently pending decision on appeal in the Illinois State courts.
By letter dated April 17, 1992, the law firm advised TFC and plaintiff that it was resigning as escrow agent effective May 8, 1992, and that, among other things, as set forth in the escrow agreement, it would deposit in court the collateral. The law firm never deposited the collateral.
By letter dated January 27, 1993, followed by further correspondence, in March, July, and August of 1993, plaintiff inquired with the law firm about the status of the collateral and ultimately requested the law firm release the collateral on the ground that the premium for the appeal bond had not been paid by TFC, as it was required to do under the terms of the escrow agreement. It is noteworthy that prior to plaintiff’s request for release of the collateral TFC filed for bankruptcy protection in March of 1993, pursuant to chapter 11 of the Bankruptcy Code.
In August 1993, Schreiber, on behalf of the law firm, refused to release to plaintiff the certificate of deposit on the ground that is was subject to a claim by TFC bankruptcy trustee and the law firm’s own retaining lien for legal services *542 rendered.[1] At that time, plaintiff learned from the defendants that the $1.2 million that funded the subject certificate of deposit was withdrawn by TFC on or about August 9, 1992, two days after the maturity date of the certificate of deposit and that the certificate of deposit was no longer funded. Consequently, this action was commenced.

The Complaint

Plaintiff commenced this action by service of the summons and complaint on or about September 28, 1993. The complaint sets out eight causes of action against the defendants.
Plaintiff maintains that the collateral of $1.2 million was released to TFC in violation of the express terms of the application letter and escrow agreement and that the defendants have improperly withheld their refusal to release the subject certificate of deposit. As a result, plaintiff asserts that the defendants are in breach of their fiduciary duty and breach of contract (the first and second causes of action), and must account to plaintiff for the collateral deposited in their custody (the third cause of action). Moreover, plaintiff maintains that as a consequence of defendants’ actions and inactions, defendants have been unjustly enriched requiring the imposition of a constructive trust and requiring the defendants to deliver the certificate of deposit and pay over the $1.2 million cash equivalent to the plaintiff (the fourth cause of action). Plaintiff further asserts equitable fraud and misrepresentation on the ground that the defendants knew or should have known that plaintiff would rely and relied upon their affirmative representations and passive omissions regarding the preserving, conserving, and reinvesting of the collateral deposited with defendants (the fifth cause of action), and that the defendants’ actions constitute conversion (the sixth cause of action), as well as monies wrongfully had and received (the seventh cause of action). Lastly, plaintiff maintains that the defendants were grossly negligent in not acting in accordance with the terms of the application letter and escrow agreement *543 (the eighth cause of action). Plaintiff seeks compensatory damages and equitable relief.

Answer

Defendants answer and deny the material allegations of the complaint. In their answer the defendants contend that TFC never transferred to defendants control to the $1.2 million that funded the certificate of deposit. Defendants do concede that TFC irrevocably delivered to them the certificate of deposit. They interpose five affirmative defenses: (1) failure to state a claim; (2) plaintiff’s negligence was the sole cause of any loss; (3) any property held by defendants belongs to TFC’s bankrupt estate; (4) plaintiff failed to join TFC, which is allegedly an indispensable party; and (5) plaintiff failed to mitigate damages in that it could have applied to the Bankruptcy Court for relief.

The Motions

Plaintiff and defendants move and cross-move for summary relief. Plaintiff also moves for preliminary injunctive relief. The court will first address the summary judgment motions and then the motion for preliminary injunction.
Plaintiff maintains that it has established, as a matter of law, that defendants have breached their fiduciary duty to plaintiff and also breached the terms of the application letter and escrow agreement, and, therefore, summary judgment is warranted on the first and second causes of action.
Defendants maintain that TFC never delivered to their control the $1.2 million that funded the certificate of deposit although they do not dispute that the certificate of deposit was irrevocably delivered to them. They argue no escrow was ever created regarding the $1.2 million and therefore, as a matter of law, the complaint should be dismissed. Defendants contend no escrow funds in that amount ever came into being and plaintiff’s claim for breach of escrow and breach of fiduciary duty based on defendants’ alleged failure to pay over to plaintiff the $1.2 million must inevitably fail. Defendants argue that delivery of the certificate of deposit was not a delivery of the funds thereunder because the certificate and the funds are completely separate entities.
As to the certificate of deposit, defendants argue that there are competing claims between the plaintiff and TFC’s bankruptcy trustee, and, thus, they have appropriately refused to *544 turn over to plaintiff the certificate in the absence of a court order.[2]
The movant on a motion for summary judgment must establish its cause of action or defense "sufficiently to warrant the court as a matter of law in directing judgment” in its favor, and it must do so by tender of evidentiary proof in admissible form (CPLR 3212 [b]; Zuckerman v City of New York, 49 NY2d 557, 562 [1980]; Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065, 1067-1068 [1979]).
Both the plaintiff and defendants maintain they have established that each is entitled to judgment as a matter of law and that none of the material facts are in dispute in the instant matter.

Escrow

An escrow is a written agreement that imports a legal obligation to deposit an instrument or property by the promisor (TFC) with a third party (the law firm) to be kept by the latter in the capacity of depositary or escrowee until the performance of a condition or the happening of an event, which then is to be delivered by the escrow agent to the promisee (plaintiff) (see generally, 55 NY Jur 2d, Escrows; see also, Animalfeeds Intl. v Banco Espirito Santo e Comercial de Lisboa, 101 Misc 2d 379 [Sup Ct, NY County 1979]). The escrow relationship is of a fiduciary nature (Director Door Corp. v Márchese & Sallah, 127 AD2d 735 [2d Dept 1987]; Oppenheim v Simon, 57 AD2d 1006 [3d Dept 1977]; Bardach v Chain Bakers, 265 App Div 24, 27, affd 290 NY 813 [1943]). Because of the nature of the relationship, the escrow agent has no lien upon the fund or property in escrow to compensate him or her for services or expenses in connection with the escrow (Entertainment & Amusements v Barnes, 49 Misc 2d 316 [Sup Ct, Onondaga County 1966], supra).
The purpose of an escrow is to assure the carrying out of an obligation already contracted for and in furtherance of the obligation the promisor deposits money, goods, or documents to an escrow agent who agrees to part with it only on a specified condition (see, Matter of Avalon E. v Monaghan, 43 Misc 2d 401 [Sup Ct, NY County 1964]). For an instrument to operate as an escrow there must be: (a) an agreement as to *545 the subject matter and delivery of the same; (b) a third-party depositary; (c) delivery of the subject matter to a third party conditioned upon the performance of some act or the happening of the event; and (d) relinquishment by the promisor (Menkis v Whitestone Sav. & Loan Assn., 78 Misc 2d 329, 330 [Nassau Dist Ct 1974]). A claim to escrow ceases when the instrument or property has been wasted or destroyed. In such an instance, the claimant becomes a common creditor of the promisor (see, Matter of Reece, 122 Misc 2d 517 [Sur Ct, Kings County 1983]).
For an instrument or property to operate as an escrow there must be a valid contract and absent such a contract the mere delivery of the instrument or property to an escrowee does not constitute a transaction in escrow (Farago v Burke, 262 NY 229 [1933]). Delivery of the instrument or property is necessary in order to have an escrow. Moreover, the delivery must be made with the intent that the condition required to release the same take effect in the future (55 NY Jur 2d, Escrows, § 6). The delivery must be made to a third person, i.e., the escrow agent (discussed supra), and the delivery must be intended by the promisor as relinquishment of any right of possession and control of the property. Although the promisor retains a contingent right to repossess the property when the specified condition does not occur, the delivery of the property must be irrevocable until the occurrence or nonoccurrence of the condition (Press v Marvalan Indus., 422 F Supp 346 [SD NY 1976] [full legal title does not pass upon the delivery of an instrument under New York law. The interest of ownership remains in the person depositing property into escrow until the conditions of the escrow agreement are fulfilled]). The property must be under the control of the escrow agent and if this is not the case then there is no delivery of escrow (Silberstein v Murdoch, 216 App Div 665 [1st Dept 1926]; Menkis v Whitestone Sav. & Loan Assn., 78 Misc 2d 329, supra).
The issue of whether delivery is conditional or absolute depends upon the intention of the parties and this is generally a question of fact for the court or jury where the evidence is not clear and there is doubt (see, 55 NY Jur 2d, Escrows, § 8, at 596).
The escrow agent’s powers are limited by the terms of the escrow agreement (Entertainment & Amusements v Barnes, 49 Misc 2d 316, supra). The escrow agent becomes trustee of the parties who have a beneficial interest in the subject matter of *546 his or her trust (Oppenheim v Simon, 57 AD2d 1006, supra) and as a result, the escrow agent becomes liable to his or her principals for damage proximately resulting from the breach of trust (Entertainment & Amusements v Barnes, supra). The escrow agent as trustee owes "the highest kind of loyalty” (Bardach v Chain Bakers, 265 App Div 24, 27, supra; Oppenheim v Simon, supra). As trustee the escrow agent must make whole the party to which he or she owes a fiduciary duty for any damages arising from the breach of the fiduciary’s duty, and the appropriate measure of damages requires placing the beneficiary in the same position it would have been in had the wrong not occurred (Town of Evans v Catalino, 88 AD2d 780, lv dismissed 58 NY2d 687 [1982]).
The escrow agent must take whatever steps may be necessary to fulfill his or her duties properly. Here, defendants’ duty was to strictly execute the terms of the escrow agreement (Farago v Burke, 262 NY 229, supra; Schuman v Conforti, 41 AD2d 661 [2d Dept 1973]), and failure to fulfill the duty entitled the third-party beneficiary of the subject matter of the escrow (herein the plaintiff) to bring an action against the escrow agent without joining the promisor (herein TFC) (see, United States v Jacobs, 304 F Supp 613 [SD NY 1969]).

The Application Letter and Escrow Agreement

The application letter addressed to the plaintiff and sent by the law firm confirmed that TFC delivered to the law firm, in escrow pursuant to the terms of the separate escrow agreement, one or more certificates of deposit in the aggregate amount of $1.2 million to indemnify plaintiff for any loss it may incur in connection with the appeal bond. Furthermore, defendants acknowledged receipt of the certificate of deposit and agreed to release to plaintiff the certificate of deposit or appropriate funds, if defendants were holding cash or equivalents, upon receiving a statement signed by plaintiff to the effect that (1) it was called to make payment by reason of the appeal bond as surety on behalf of TFC or (2) any premium thereon was unpaid and overdue.[3]
The application letter further stated that the "certificates of deposit or funds, as the case may be, will not be released to *547 anyone else” without first receiving plaintiffs written permission to do so (defendants’ affidavits in opposition, exhibit A).
The application letter referred to the escrow agreement dated May 10, 1991, between TFC and defendants. Therein TFC "irrevocably appointed] [defendants’] Escrow Agent to receive, hold, administer and deliver the Collateral in accordance with [the] Escrow Agreement” (ibid,., exhibit B, 1). The collateral is described in the escrow agreement as one or more certificates of deposit. Moreover, defendants shall hold in escrow the "certificate of deposit and/or the cash proceeds thereof, if such certificate or certificates of deposit matures during the time the [Appeal] Bond remains in force and such proceeds are not reinvested in replacement certificates or other investments permitted by the Escrow Agreement” (ibid., at |[ 2). Pursuant to the escrow agreement, defendants agreed to "hold and deliver the collateral (in whatever form it may be then held)” and may be held on behalf of defendants by any bank as the defendants may select (ibid., at ]j 2). Moreover, defendants were authorized to invest and reinvest the proceeds of the collateral in any of the following forms of investment as defendants selected, e.g., treasury bills or notes, certificate of deposit, in each case with maturity dates no later then 30 days after the date of investment, unless TFC and plaintiff permitted otherwise. The release of the collateral could only be done in accordance with the application letter or the provisions of the escrow agreement.
Lastly, the escrow agreement contained the provision that it could not be enforced by or inure to the benefit of the plaintiff. Without considering the validity of that provision and irrespective of the same, the defendants are independently liable to plaintiff for breach of the application letter which the court finds incorporates by reference the terms of the escrow agreement. In fact, the plaintiff is the intended beneficiary of the escrow agreement and the court will interpret the escrow agreement in light of that circumstance, and will refuse to construe the same to the deprivation of the escrow beneficiary (Casolaro v Blau, 4 Misc 2d 206, supra).[4]

Certificate of Deposit

In order to determine what defendants received initially from TFC the court shall discuss what a certificate of deposit consists of.
*548 A certificate of deposit is a written acknowledgment by a bank of the receipt of money with an engagement to repay it (Perez v Chase Manhattan Bank, 93 AD2d 402, 413 [1st Dept 1983], revd on other grounds 61 NY2d 460 [1984], cert denied 469 US 966 [1984]; see also, Gerard v Bank of N. Y. & Trust Co., 265 NY 336 [1934], reh denied 266 NY 544 [1935]). In this instance, the certificate was a time certificate payable on a specific date (Edelmann v Chase Manhattan Bank, 861 F2d 1291 [1st Cir 1988] [certificate which provided a definite date for repayment and included an acknowledgment by the bank of receipt of money with an engagement to repay it was a time certificate under New York law]).
A certificate of deposit is in effect a loan to a bank by the depositor for an agreed period of time at a stated rate of interest (Murray Director Affiliates v Laventman, 70 Misc 2d 571 [Civ Ct, NY County 1972]), whereby the relation of debtor and creditor between the bank and the depositor is created (see generally, 5B Michie, Banks and Banking, § 313 et seq. [hereinafter cited as Michie]). The certificate of deposit, even if nonnegotiable, can be assigned (Michie, op. cit., at 385), it can also be passed by delivery without indorsement by the person to whose order it is made payable (Michie, op. cit., § 321, at 401).
The record reveals that TFC irrevocably delivered to defendants the certificate of deposit as collateral to be placed in escrow. Defendants were to irrevocably receive, hold, administer and deliver the collateral in accordance with the terms of the escrow agreement and application letter. At the time of its delivery, the collateral consisted of the certificate of deposit issued May 9, 1991, by the Chase Manhattan Bank (the bank). This issuance was followed by the application letter and escrow agreement executed on May 10, 1991.
The certificate further indicates that it was a nonnegotiable time certificate in the amount of $1.2 million,[5] with interest payment of 5.750%, to be paid at maturity on August 7, 1991. The certificate’s $1.2 million amount was transferred from TFC Chase Manhattan Bank account No. 089-016792. The certificate was not to be rolled over, i.e., the bank was to hold the principal and interest and it is assumed by the court that *549 the bank was to await instructions before or after the certificate’s maturity.
TFC’s transfer of the $1.2 million into another deposit is significant for the purpose of determining the issue of title. In this instance, the $1.2 million was a general deposit of funds (Brigham v McCabe, 27 AD2d 100, affd 20 NY2d 525 [1967]), and therefore title of the money passed to the bank with the obligation of the bank to repay such money in the future. The general deposit was mingled with other deposit monies of the bank and the entire amount formed a single fund from which all depositors were paid (see generally, 9 CJS, Banks and Banking, § 273, at 557; see also, Gross v West New Brighton Bank, 181 Misc 1, affd 267 App Div 964 [2d Dept 1944]; Utica Sheet Metal Corp. v Schecter Corp., 47 Misc 2d 290, mod on other grounds 25 AD2d 928 [3d Dept 1966]).
Defendants submit the affidavit of S. Joseph Domina, vice-president of the bank, to support their claim that the issuance by the bank of the certificate conveyed no interest or control of the funds to the bank or to them and that TFC maintained possession over the funds. Therefore, they argue no escrow came into being with regard to the $1.2 million when TFC delivered the certificate of deposit.
However, the certificate specifically states that the bank reserved the right not to consent to the early withdrawal of the funds and in the event of an early withdrawal the bank was permitted to impose penalties. The bank’s right not to consent to an early withdrawal and to hold the funds until maturity constitutes control of the funds by the bank, at least until August 7, 1991, the date the certificate matured. As discussed, the bank has title over general deposit of funds. In this instance, the evidence establishes that the certificate of deposit involved a general deposit of funds. The certificate contains no language that the funds thereunder were deposit for a special purpose, e.g., specific funds to be used as collateral.[6] The certificate simply recites that it is for a certain sum payable at a certain date. Hence, title to the deposited funds passed to the bank (9 CJS, Banks and Banking, § 315, at 641, citing Fidelity & Cas. Co. v Farmers Natl. Bank, 160 Misc 510, read on other grounds 249 App Div 348, affd 275 NY 194 [1937]).
The record also reveals that from May 9, 1991 to August 9, *550 1991, the $1.2 million remained untouched, and TFC did not request the early withdrawal of those funds during that time period. Although a certificate of deposit and the funds represented by it are independent legal entities (see, Michie, op. cit., § 313, at 383), this does not change the fact that when TFC delivered the certificate of deposit to defendants it could not deliver title to the $1.2 million to defendants because, pursuant to the terms of the certificate as well as principals of banking law, the title and control of those funds were in the hands of the bank. Moreover, TFC’s action of not requesting an early withdrawal confirms the fact that it gave control of the $1.2 million over to the bank unless it consented to TFC’s early withdrawal of them which the record reveals TFC did not request and supports the finding, as a matter of law, that TFC handed control of the $1.2 million over to the bank until the maturity of the certificate of deposit, i.e., August 7, 1991.
Thus, now, the question presented is who would have title to the $1.2 million after the certificate matured. The certificate of deposit was the instrument TFC had control over and it was the instrument it irrevocably delivered in escrow to defendants. The certificate clearly stated it was funded by $1.2 million. Title of the $1.2 million would automatically revert back to TFC on August 7, 1991, because the bank’s power to withhold consent to an early withdrawal expired on that date by operation of law and logic. On August 7, 1991, the $1.2 million was no longer subject to the bank’s control. The record does not indicate that defendants, as escrow agent, acted in any way on or before August 7, 1991, to secure whatever collateral existed on the date the certificate matured. The record does reveal that two days after the certificate matured, on August 9, 1991, TFC requested the transfer of the $1.2 million to one of its other accounts. The record also reveals that there is no information on the whereabouts of the $1.2 million and the court assumes if any funds are available they are now intermingled with funds that are now part of the bankrupt estate and under the control of TFC’s bankruptcy trustee. Plaintiffs claim to the specific escrow ceased and as to TFC plaintiff became a common creditor (Matter of Reece, 122 Misc 2d 517, supra), but this does not bar plaintiff’s claim of breach of fiduciary duty and breach of contract against the escrow agent.

Defendants’ Duty

As escrow agent, Schreiber acting on behalf of law firm, was the fiduciary of the plaintiff (Muscara v Lamberti, 133 AD2d *551 362 [2d. Dept 1987]). "From the time the deposit is made the escrow agent becomes the trustee of both the party making the same and the one for whose benefit it is made” (Mechanic’s Natl. Bank v Jones, 76 App Div 534, 545, affd 175 NY 518 [1903]). As discussed, as fiduciary the defendant owed plaintiff "the highest kind of loyalty” (Bardach v Chain Bakers, 265 App Div, at 27, supra), and to take "such actions as may be necessary” to protect any party with a beneficial interest in the escrow fund (Helman v Dixon, 71 Misc 2d 1057, 1059 [Civ Ct, Queens County 1972]). Here, the duties of the escrow agent were, inter alla, to hold and to preserve either by investment or reinvestment of the collateral deposited with them for the benefit of the plaintiff.
Escrow agents are considered to be trustees (Farago v Burke, 262 NY 229, supra). The primary objective of the fiduciary (trustee) should be preservation of the escrow funds (cf., Matter of Newhoff, 107 Misc 2d 589, affd 107 AD2d 417, lv denied 66 NY2d 605 [1985]). The escrow agent is obligated to exercise that degree of care which a prudent person of discretion and intelligence would employ in their own like affairs (cf., Matter of Hahn, 93 AD2d 583, affd 62 NY2d 821 [1984]; see also, Matter of Frey, 55 Misc 2d 567 [Sur Ct, Nassau County 1967] [primary duty of all fiduciaries is to make fund in their hands productive and not to keep it "laid up in a napkin”]).
TFC irrevocably appointed defendants as escrow agent for the purpose of receiving, holding, administering and delivering the collateral. At the time of the appointment, the collateral delivered to defendants by TFC was the certificate of deposit. However, as set forth in the escrow agreement, if the certificate matured during the time the appeal bond remained in force then the $1.2 million that was subject to the certificate was to be reinvested in replacement certificates or other investments permitted by the escrow agreement. The terms of the escrow agreement are clear and they specifically evidence TFC’s intent of giving defendants all power to hold and deliver the collateral, be it in the form of the certificate of deposit at the time it was delivered or be it in the form of $1.2 million, i.e., in whatever form it may be then held and maybe held.
TFC and defendants contemplated the situation where the certificate would mature and that the $1.2 million, once under *552 the control of the bank, would revert back to TFC but, TFC already agreed with defendants under the escrow agreement that defendants would be authorized as escrow agent to invest and reinvest the collateral, then $1.2 million, as long as the appeal bond remained in force. This was a duty of the defendants and when the certificate matured the defendants were required to act in a manner that complied with the obligations set out in the escrow agreement.
The record reveals defendants did nothing on August 7, 1991. They do not contend they contacted the bank prior to the certificate’s maturity date advising the bank of the existence of the escrow agreement and the application letter, and that defendants were given the irrevocable power to hold and administer the collateral in whatever form it may have been on August 7, 1991.
The record does reveal that TFC took the opportunity to transfer the $1.2 million that was no longer under the bank’s control and without intervention by the defendants as escrow agent. The defendants failed to make an independent assessment of the collateral’s condition prior to or before the date of the certificate’s maturity. The defendants having done nothing to follow up on the certificate or to secure the collateral after the certificate matured and thereby allowed TFC to move the $1.2 million without approval by plaintiff. Defendants failed to hold, conserve, and maintain the collateral. Defendants’ failure constitutes, as a matter of law, breach of fiduciary duty and breach of the application agreement.

Damages

The appropriate measure of damages requires placing plaintiff in the same condition it would have been in had the wrong not occurred (Town of Evans v Catalino, 88 AD2d 780, supra). Had defendants maintained the collateral plaintiff would be safe from any loss as a result of its issuance of the appeal bond and its rights to indemnity in the event it is compelled to pay the Prince (supra) judgment that had been secured by the $1.2 million.
Accordingly, the plaintiff’s motion for an order granting summary judgment on the first and second causes of action is granted.[7] Plaintiff has established its causes of action sufficient *553 to warrant the court to grant summary judgment in its favor (Zuckerman v City of New York, 49 NY2d 557, supra).
Consequently, the plaintiffs motion for preliminary injunction is also granted to the extent that defendants are directed to deliver the subject certificate of deposit to the plaintiff. The certificate was placed in escrow more than 90 days prior to the bankruptcy filing of TFC. It is neither part of the bankrupt estate nor subject to the jurisdiction of the Bankruptcy Court (see, Matter of O.P.M. Leasing Servs. v Blue Cross & Blue Shield, 46 Bankr 661 [SD NY 1985]; see also, 1A Bankruptcy Service-Lawyers Ed, part 5, § 5C:133, at 124-125). Plaintiff has established its entitlement to preliminary injunction (see, Brashi v Stahl Assocs. Co., 74 NY2d 201 [1989]).

Conclusion

To recapitulate, the plaintiffs motions are granted and defendants’ cross motion is denied.

. The law firm had acted as counsel to TFC on prior occasions. In fact, defendants represented TFC at the time defendants agreed to act as escrow agent on behalf of the plaintiff and TFC. The law firm drafted the escrow agreement and application letter. Plaintiff was aware of this relationship but nevertheless agreed to have defendants act as escrowee (see, Casolaro v Blau, 4 Misc 2d 206, 208 [Sup Ct, Queens County 1956] [attorney of one of the parties may act as escrow agent for both parties on consent of the parties]).

. At this juncture of the motions, defendants have abandoned their lien claim upon the escrow (see also, Entertainment & Amusements v Barnes, 49 Misc 2d 316 [the escrow agent has no lien upon escrow funds or property]).

. The defendants do not dispute that a premium was overdue and thus setting into motion the provision in the escrow agreement regarding the release of the escrow "property”.

. Defendants do not dispute the fact that they drafted both agreements.

. Accordingly, the certificate is an instrument subject to defenses and the holder thereof is not a holder in due course under UCC 3-104 (1). The certificate does not constitute commercial paper (National Bank v Flushing Natl. Bank, 72 AD2d 538 [1st Dept 1979]).

. Had the deposit been a special deposit then title would have remained with the depositor (9 CJS, op. cit., §§ 273, 315).

. Defendants’ contention that plaintiff contributed to its loss is of no moment. Contributory negligence is not a defense to a cause of action for *553 breach of an escrow agreement (Royal Bank & Trust Co. v Weintraub, Gold & Alper, 68 NY2d 124 [1986]). Moreover, the contention that the defense is applicable to legal malpractice actions is also of no moment. This is an action for breach of fiduciary duty and contract (but cf., Caiati v Kimel Funding Corp., 154 AD2d 639 [2d Dept 1989]).