**In re NETIA HOLDINGS S.A., et al., Debtors in a Foreign Proceeding.**

**No. 02–10744 REG.**

United States Bankruptcy Court, S.D. New York.

May 14, 2002.

Weil Gotshal & Manges LLP, by Marcia L. Goldstein, Robert G. Sugarman, Sascha N. Rand and Scott E. Cohen, New York City, for Petitioners.

Friedman Kaplan Seiler & Adelman LLP, by Anne E. Beaumont and Heather Windt, New York City, for SISU Capital Limited.

Cadwalader Wickersham & Taft, by Gregory Petrick and Richard Nevins, New York City, for Ad Hoc Committee of Note-holders.

Shipman & Goodwin LLP, by Ira H. Goldman and Kathleen M. LaManna, Hartford, CT, for the Indenture Trustee.

Sonnenschein, Nath & Rosenthal, by Carol Neville and Mathew T. Bergman, New York, for Triage Capital Management, L.P.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR PRELIMINARY INJUNCTION

ROBERT E. GERBER, Bankruptcy Judge.

This case under section 304 of the Bankruptcy Code—a case ancillary to a foreign proceeding—was commenced by the members of the management board of Netia Holdings S.A. ("Netia Holdings"), Netia Telekom S.A. ("Netia Telekom") and Netia South Sp. z. o.o. ("Netia South," and together with the others, "Netia," or the "Foreign Debtors"), corporations organized under the laws of Poland. They seek preliminary and permanent injunctions granting them orders:

(1) akin to the automatic stay, preventing any act to obtain possession or exercise control over property of the Foreign Debtors in the United States— to prevent the grabbing of assets, including, most significantly, any draw upon funds, discussed below, that were placed with an indenture trustee in the United States to provide comfort that the interest on one of the issues of the Foreign Debtors' notes would be paid; and

(2) awarding turnover to the Foreign Debtors of the assets that had been placed with the indenture trustee.

Both prongs of the requested relief are opposed by bondholders SISU Capital Limited ("SISU"), Triage Capital Management Limited Partnership, Triage Offshore Limited Partnership and OTA Limited Partnership (the latter three of which are collectively "Triage," and, together with SISU, the "Objecting Bondholders").

The motion, insofar as it seeks a preliminary injunction preserving the status quo and to protect the assets from being taken, is granted, for the reasons set forth below. The remainder of the motion—seeking

turnover and permanent injunction relief—is taken under submission.

The following are the Court's Findings of Fact and Conclusions of Law in connection with the motion.

### Facts

The facts are not in dispute. Background facts necessary to an understanding of the preliminary injunction motion,[1] and facts specifically relevant to the issues here, are set forth below.

### 1. Background

Netia Holdings is a provider of fixed-line telecommunications services in Poland; it has stated that it is the largest alternative provider of such services in that country. Netia Telekom and Netia South are subsidiaries of Netia Holdings.

SISU is the general partner of the investment managers SISU Capital Limited Partnership and SISU Capital Limited Partnership II. SISU is based in London, England, and through certain of its investment funds is the holder of positions in several series of debt instruments issued by subsidiaries of Netia Holdings and guarantied by Netia Holdings.

One of those series of notes is the issue of 13–3/4% Senior Euro Notes due 2010, which were issued pursuant to an indenture dated as of June 9, 2000 (the "2000 Notes"). As a holder of the 2000 Notes, SISU is a beneficiary of contractual arrangements, alleged by the Objecting Bondholders to be an escrow (the "Alleged Escrow"), granted by Netia Holdings and held by an indenture trustee, State Street

Bank and Trust Company ("State Street"), in Massachusetts,[2] to help ensure that holders of the 2000 Notes would receive the first four semi-annual interest payments thereunder.

It is undisputed that Netia Holdings II B.V., a Netherlands corporation (the "Financing Subsidiary"), the issuer of the 2000 Notes and a financing subsidiary of Netia Holdings, is in default on those notes (by reason of cross-default provisions under the 2000 Notes, triggered by defaults by the Financing Subsidiary under two other series of its notes) as is Netia Holdings, which is a guarantor of those notes. Most, or all, of the Foreign Debtors' other note obligations are in default as well—accounting, at least in substantial part, for the proceedings in Poland with respect to which this Court has been requested to provide assistance.

### 2. The Arrangement Proceedings in Poland

Under Polish law, once a debtor realizes it is unable pay its debts as they come due, the members of the management board must authorize the commencement of an insolvency proceeding or risk personal liability for debts incurred by the debtor. Polish insolvency law provides for two avenues of protection from creditors. A debtor may (1) wind-up operations and liquidate its assets through the Bankruptcy Law, or (2) seek to restructure its debt obligations and preserve its existence as a going concern under Poland's Arrangement Proceedings Act. In this case, the Foreign

---

**1.** Those facts, and others, were set forth at some length in the Court's decision denying the Objecting Bondholders' motion to dismiss the case, *In re Netia Holdings S.A.*, 277 B.R. 571 (Bankr.S.D.N.Y.2002) (*"Netia I"*). To the extent facts found in *Netia I* and/or citations with respect to those facts are relevant to this

determination and are not included here, they are incorporated in these findings by reference.

**2.** Decl. of Anne E. Beaumont, dated April 12, 2002 ("Beaumont Decl. # 1"), Exh. E (the "Investment Agreement").

Debtors elected to proceed under the Arrangement Proceedings Act, to restructure their obligations as an alternative to liquidation.

On February 20, 2002, each of the Foreign Debtors filed applications for the opening of arrangement proceedings (the "Applications") in the District Court for the Capital City of Warsaw, XVII Economic Division for Bankruptcy and Arrangement Proceedings (the "Polish Court"). While the filing of the Applications commenced proceedings in Poland, they were not then "opened";[3] thereafter, the arrangement proceeding for one of the Foreign Debtors, Netia Telekom, was "opened," and, so far as the record reflects, the arrangement proceedings with respect to the other two, Netia Holdings and Netia South, are pending.

Also on February 20, 2002, the Foreign Debtors filed their petitions in this Court to commence the three jointly administered cases that together constitute this section 304 case, and sought a temporary restraining order ("TRO") prohibiting various forms of conduct with respect to the Alleged Escrow as well as numerous other forms of conduct with respect to Netia and State Street, the indenture trustee under Netia's bond issues. This Court entered the requested TRO on that day, and the TRO was subsequently extended through the date of the preliminary injunction hearing by consent of the parties then appearing in the proceeding. A motion by the Objecting Bondholders to vacate the TRO, heard before the preliminary injunction hearing, was denied.

Before the preliminary injunction motion now before this Court was heard, the Objecting Bondholders moved to dismiss the case, but their motion was denied in *Netia I.* This Court then held, among oth-

er things, that the Polish arrangement proceeding, in either its "opened" stage (as it was with respect to Netia Telekom) or in its pre-opening stage (as it was with respect to Netia Holding and Netia South), was a foreign proceeding within the meaning of Bankruptcy Code sections 304(a) and 101(23).

### 3. The Contractual Documents

Relevant to this motion are the contractual documents executed by the Foreign Debtors giving rise to the Objecting Bondholders' rights with respect to the 2000 Notes, and (though their relevance is limited by the parol evidence rule, as discussed below) documents that evidence the Foreign Debtors' intent. One in particular is significant—the Investment Agreement, dated June 9, 2000.

#### (a) Investment Agreement

As described in recitals to the Investment Agreement (which was written in English), the Financing Subsidiary issued the 2000 Notes—in the aggregate principal amount of £200,000,000—and the issue was guarantied by Netia Holdings (there referred to as "Parent"). As also described in the recitals, Netia Telekom and Netia South (there referred to as "Payors") and the Financing Subsidiary entered into an agreement under which the Financing Subsidiary lent the net proceeds obtained from issuance of the 2000 Notes to the Payors.

Under the Investment Agreement, proceeds from the offering in the amount of approximately £52,000,000 were deposited with State Street and invested in investment securities—an amount sufficient to cover the Financing Subsidiary's first four semiannual interest payments under the 2000 Notes. State Street currently holds

---

**3.** *See Netia I* for a discussion of the distinc-    tion.

a fund in cash and securities of a value of approximately £ 13,000,000—approximately $12,000,000 (U.S.)—under the Investment Agreement, the rights to which are in dispute, and whose preservation and recovery is the motion's principal purpose.

It is that fund that the Objecting Bondholders contend is an escrow. The Investment Agreement did not, however, ever refer to itself as an "escrow agreement" or refer to the fund as an "escrow," and, indeed, the word "escrow" appears nowhere in the Investment Agreement.

The Investment Agreement did provide that State Street would hold the funds in a segregated account in the name of State Street, to be entitled "Investment Account for Netia Holdings II B.V.";[4] that State Street would have "sole dominion and control" over the account in which the funds were to be held;[5] and that "the Investment Account shall at all times remain under the exclusive dominion and control of the Trustee [State Street]."[6] However, it so stated "subject to the terms of this Agreement"[7]—which would include, of course, other provisions, quoted below. The Investment Agreement further provided, in relevant part:

> [I]t shall be a term and condition of the Investment Account, notwithstanding any term or condition to the contrary in any other agreement relating to the Investment Account and except as otherwise provided by the provisions of Article 9 of this Agreement or otherwise provided by this Agreement, that no amount . . . shall be paid or released to or for the account of, or withdrawn by or for the account of, the Payors or any

other person or entity other than the Trustee from the Investment Account. (Investment Agreement § 4.2).

But like the predecessor language, the language of section 4.2 had an exception,— "except as . . . *otherwise provided* by this Agreement." (Emphasis added). The Investment Agreement did "otherwise provide[ ]"; it provided, in relevant part:

> The Investment Interest forms part of the general assets of the Payors available to their creditors in the event of an insolvency in accordance with applicable insolvency laws.

(Investment Agreement § 12).[8]

Rights under the Investment Agreement are governed by the laws of the State of New York.

As noted below, Triage contends, that if the arrangement at State Street did not constitute an escrow agreement, it should be regarded as granting the Objecting Bondholders a lien. The Court finds, with respect to this contention, that contractual language to that effect is notably lacking. The Investment Agreement never says that a lien or security interest has been granted, or uses words of like import. No document calling itself a security agreement, or using words of like import, has been presented to the Court. Moreover, section 12 of the Investment Agreement contains language flatly contrary to this contention:

> Anything in this Agreement to the contrary notwithstanding, no pledge, security interest or lien (or any other interest that would constitute a Lien under and

---

4. Investment Agreement, Recitals.

5. *Id.*

6. Investment Agreement § 4.1.

7. *Id.*

8. Similarly, another of the recitals to the Investment Agreement provided that "[t]he assets deposited in the Investment Account are the property of the Payors [i.e., Netia Telekom and Netia South]."

as defined in the Indenture) shall be created or deemed to be created by this Agreement, and any provision determined by a court of competent jurisdiction to create any such interest shall be null and void, ab initio.

### (b) Other Contractual Matters

An indenture agreement ("Indenture Agreement")[9] was also entered into at the time of the issuance of the 2000 Notes, but the Indenture Agreement does not present anything undercutting the provisions set forth above, and is only modestly relevant. It does contain certain covenants generally prohibiting Netia Holdings or any of its subsidiaries from granting any liens other than those expressly permitted. (Indenture Agreement § 9.13).

### 4. Evidence of Intent

Also said by one or another of the parties to be relevant are various argued manifestations of the parties' intent. They include the terms of three documents which, while not contractual documents creating substantive rights and obligations, nevertheless characterized them, and a fourth, which the Foreign Debtors contend should be contrasted to the contractual documents here, and show that the Foreign Debtors knew how to create an escrow when they wanted to. Findings with respect to those are as follows.

### (a) The Prospectus (June 2000)

In connection with the issuance of the 2000 Notes, the Financing Subsidiary issued a prospectus, dated June 2, 2000 (the "Prospectus").[10] Like the Investment Agreement, it was written in English, and, indeed (at least relative to other prospec-

tuses), plain English. The Prospectus stated, on its cover page:

> We will use a portion of the proceeds of this offering to purchase a portfolio of Investment Securities which will generate sufficient proceeds to make the first four scheduled interest payments on the Notes. See Risk Factors—The Investment Securities Are Unsecured Assets.

(Prospectus).

The Prospectus further stated on its cover page, in a section captioned "Ranking":

> The Notes and the guarantees will be general unsecured obligations of the issuer and the guarantor, respectively. The Notes and the guarantees rank equal in right of payment with all existing and future unsecured and unsubordinated obligations of the issuer and the guarantor, respectively.

*Id.* It stated substantially the same thing in a term sheet captioned "The Offering," setting forth key aspects of the offering. (*Id.* at 8).

In its section captioned "Risk Factors," in a subsection captioned "The Investment Securities Are Unsecured Assets," the Prospectus was even more specific:

> The Investment Securities to be held by the trustee for the Notes or its agent to provide for payment in full of the first four scheduled interest payments on the Notes will be general unsecured assets of Netia and, therefore, in the event of insolvency, liquidation, reorganization, dissolution or other winding-up of Netia, the Investment Securities would be available to satisfy the claims of creditors of Netia. As a result, in the event of any distribution or payment of the assets of Netia in any foreclosure, dissolution, winding-up, liquidation, reorgani-

---

**9.** Beaumont Decl. # 1 Exh. D.

**10.** Decl. of Marcia L. Goldstein, dated April 29, 2002 ("Goldstein Decl."), Exh. E.

zation or other bankruptcy proceeding, other holders of indebtedness of Netia may have a prior claim to the Investment Securities or may participate ratably with all holders of unsecured Indebtedness of Netia, and potentially with all other general creditors of Netia, based upon the respective amounts owed to each holder or creditor, in the Investment Securities.

(*Id.* at 16).

### (b) The Restructuring Plan (March 2002)

In March 2002, after this section 304 case was filed, the Foreign Debtors announced that the Foreign Debtors, an informal committee of their bondholders, and other stakeholders had agreed on a restructuring plan.[11] Counsel for the Foreign Debtors circulated to bondholders a draft restructuring agreement, dated as of March 5, 2002 (the "Draft Restructuring Agreement").[12] It provided, in relevant part, in a term sheet captioned "Detailed Terms for the Restructuring," in a subsection captioned "Cash":

> Cash on hand will be retained by the Company. The escrowed funds (*"Escrowed Funds"*) in respect of the 2000 Notes are presently subject to a TRO obtained by the Company under Section 304 U.S. Bankruptcy Code. It is agreed that the TRO will remain in force until the later of the Financial Restructuring Consummation and the ratification of the Polish Arrangement Proceedings by the U.S. Bankruptcy Court. Prior to the Financial Restructuring Consummation, the Escrowed Funds will remain on deposit with the 2000 Notes' Trustee, State Street Bank and Trust Company (*"State Street"*). Upon the Financial

> Restructuring Consummation it is agreed that the Escrowed Funds will be turned over to the Company. Should for any reason the Financial Restructuring Consummation fail to occur upon the terms and subject to the conditions of this Term Sheet and the Restructuring Agreement to which this Term Sheet is attached, then the legal and/or other rights of the Company, State Street and each Consenting Noteholder to seek to set aside the TRO and/or to seek to turn over of all or part of the Escrowed Funds either to the Company, or to each Consenting Noteholder, or to holders of the 2000 Notes, respectively, shall be expressly reserved.

(*Id.* at 38) (underlining in original).

### (c) Financial Statements for 2001 (February 2002)

A few weeks later, on March 28, 2002, Netia Holdings issued an annual report for 2001 ("2001 Annual Report"),[13] filed with the SEC in the United States. Included as part of the 2001 Annual Report were Netia Holdings' consolidated financial statements (as of December 31, 2001), dated February 18, 2002, and a report of its accountants of that same date. The notes to those financial statements stated, in relevant part, in Note 6, captioned "Restricted Investments":

> In June 2000, the Company deposited EUR 52,400[000] ... in an "Investment Account" with the trustee for its 2000 Notes. All amounts are invested in German Government Treasury Notes bearing fixed interest rates ranging from 4.5% to 5.0% and only may be use [*sic.*] to satisfy the Company's interest payments on the 2000 Notes. The German

**11.** Declaration of Anne E. Beaumont, dated April 24, 2002 ("Beaumont Decl. # 2"), Exh. D.

**12.** *Id.* Exh. E.

**13.** Beaumont Decl. # 1 Exh. C.

Government Treasury Notes expire in six month increments set to coincide with the interest payment dates established under the terms of the 2000 Notes.... As December 31, 2001, three payments of EUR 13,750[000] have been made from this account.

(2001 Annual Report at F–17). The funds at State Street that the Objecting Bondholders contend were in an escrow were shown on Netia Holdings' balance sheet as an asset, in the subsection captioned "Current Assets," (*id.* at F–3), cross-referencing to Note 6 for the more detailed discussion quoted above.

### (d) Earlier Notes' Escrow Agreement (November 1997)

In November 1997, the Financing Subsidiary issued another of its several issues of notes—10–1/4% Senior Notes due 2007 ("1997 Notes"), in the aggregate principal amount of $200,000,000.[14] It had a negative covenant in its indenture, prohibiting Netia Holdings and (subject to further management board action) its existing subsidiaries from granting any liens other than those expressly permitted.[15]

At about the same time, Netia Holdings and State Street entered into an "Escrow Agreement," as of November 3, 1997 (the "1997 Escrow Agreement").[16] As is apparent from its name, it expressly referred to itself as such. The 1997 Escrow Agreement expressly referred to the "pledge" of securities, "to secure the obligations of the Pledgor under the Indenture to guarantee the payment in full of each of the first six scheduled interest payments on the Notes and to secure repayment of the principal, premium (if any) and interest on the Notes...." [17] In addition to repeatedly us-

ing the words "pledge" and "secure," and variants of them, the 1997 Escrow Agreement expressly stated:

> ...*Pledgor* has agreed to (i) *pledge* to the Senior Notes Trustee for its benefit and the ratable benefit of the Holders of the Notes, a *security interest* in the *Pledged* Securities (as defined herein) and related *collateral* and (ii) execute and deliver this *Escrow Agreement* in order to secure the payment and performance by the *Pledgor* of all the Obligations.

*Id.* (emphasis added).

The Court finds, as a fact, that Netia Holdings knew how to use the terms "Escrow Agreement," "pledge," "collateral," and "security interest" when it wanted to, and that it expressly utilized such terms, in connection with a transaction in 1997, but did not do so in connection with the 2000 Notes.

### 5. Other Matters

In March 2001, Netia Holdings, Netia Telekom and Netia South entered into an agreement under which Netia Telekom and Netia South (the "Payors" under the Investment Agreement) assigned their rights in the Investment Agreement—including the investment account at State Street—to Netia Holdings. Accordingly, it appears (though this might be regarded as more appropriately within the jurisdiction of the Polish court) that any interests transferred by Netia Telekom and Netia South would now be interests of Netia Holdings, forming part of its estate, and thus are available to creditors in the event of its insolvency and/or an insolvency of Netia Telekom or Netia South.

---

**14.** Goldstein Decl. Exh. G.

**15.** *Id.* at § 1013.

**16.** Goldstein Decl. Exh. H.

**17.** *Id.* at 1.

In December 2001, the Financing Subsidiary did not make interest payments on two other issues of its notes, but it did make the interest payment due on its 2000 Notes.[18]

## Discussion

■ It is undisputed that under section 304(b) of the Code, the Court has the power to grant both types of relief requested by the Foreign Debtors. While it is also undisputed that under section 304(c) of the Code, Congress has laid out standards for the Court to apply in determining whether to grant any particular relief under section 304(b), it is also the case that, at least insofar as enjoining dissipation of estate assets is concerned, the Objecting Bondholders have not contended that relief is inappropriate under section 304(c).[19] Rather, they base their argument on three contentions: (1) that the fund in question is an escrow for their benefit, and not property of the Foreign Debtors' estates, or, alternatively, (2) that a lien was created for their benefit or (3) that a constructive trust should be imposed with respect to the funds held at State Street. The Court determines the motion for a preliminary injunction in that context.

### 1. Preliminary Injunction Standards

The Foreign Debtors assert that where, as here, they are seeking injunctive relief under section 304(b), they need only satisfy the requirements of that section and that traditional preliminary injunction analysis is inapplicable,[20] but they also assert that they meet the traditional standards or a preliminary injunction as well. As the Court agrees with the latter point, and finds that the traditional requirements for a preliminary injunction in the Second Circuit have been satisfied, it simply decides the preliminary injunction motion on those narrower grounds.

■ The standards applicable to the issuance of a preliminary injunction in this Circuit are not subject to dispute. To prevail on a motion for a preliminary injunction, the moving party must show: (a) that it will suffer "irreparable harm in the absence of an injunction" and "(b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor."[21]

### (a) Irreparable Injury

■ The requirement for irreparable injury has plainly been satisfied. It is well established, at least in this district, that the dissipation of the finite resources of an insolvent estate constitutes irreparable injury.[22]

---

**18.** Beaumont Decl. # 2 Exh. B.

**19.** Triage has raised section 304(c) objections with respect to turnover (*see* Triage Joinder in SISU's opposition, filed April 24, 2002) (Docket # 34) ("Triage Joinder"), at 2, but not with respect to an injunction against grabbing assets.

**20.** *See* Foreign Debtors' Mem. of Law, filed February 20, 2002 (Docket # 3) ("Foreign Debtors' Br.") at 17.

**21.** *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 172 (2d Cir.2001); *see also Polymer Technolo-*

*gy Corp. v. Mimran*, 37 F.3d 74, 77–78 (2d Cir.1994); *Feit & Drexler, Inc. v. Drexler (In re Feit & Drexler, Inc.)*, 760 F.2d 406, 415 (2nd Cir.1985); *Petition of Caldas*, 274 B.R. 583, 598 (Bankr.S.D.N.Y.2002) (Gerber, J.).

**22.** *See In re Lines*, 81 B.R. 267, 270 (Bankr. S.D.N.Y.1988) (Buschman, J.) ("With respect to irreparable injury, we note that there appears to be little dispute regarding the notion that the premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury."); *In re Rubin*, 160 B.R. 269, 283 (Bankr.S.D.N.Y.1993)

Thus it is clear that the irreparable injury requirement is satisfied with respect to the Foreign Debtors' motion insofar as they seek to enjoin any proceedings in New York that would involve efforts on the part of the Objecting Bondholders, or others, to enforce any rights they might have against the fund or other assets of the Foreign Debtors in the United States.

### (b) Likelihood of Success/Serious Issues

The Objecting Bondholders argue that the assets in the Alleged Escrow can be used only for their benefit, and are not property of the Foreign Debtors' bankruptcy estates. Alternatively, the Objecting Bondholders argue that the contract arrangements granted a lien in their favor, and/or that a constructive trust with respect to the assets in the Alleged Escrow should be imposed for their benefit.

### (i) Alleged Escrow

With respect to the Objecting Bondholders' principal argument—the alleged existence of an escrow—no one could seriously dispute that the Foreign Debtors have raised serious issues going to the merits, since the last sentence of § 12, at the very least, provides expressly that the assets at State Street are to be used, in the event of an insolvency, to satisfy the claims of all creditors and not just the holders of the

2000 Notes.[23] But in addition, the Court also finds a likelihood of success. Assuming, as the Court does for the purposes of this analysis, that the standards for creation of an escrow under New York law are exactly as SISU has described them[24] (and that it is unnecessary, as a matter of New York law, to ever mention the word "escrow" to create one), the Foreign Debtors have nevertheless shown at least a likelihood of success on their position that no escrow was created, for failure on the part of the Objecting Bondholders to show that the third requirement was satisfied—the requirement that the grantor "relinquishes control over the deposit."

The last sentence of section 12 of the Investment Agreement is exactly the opposite of relinquishment of control by the grantor over the deposit, and to the contrary, is a reservation of control over the deposit in the event of insolvency. While parol evidence might be admissible in the event of any ambiguity in that language, the Court finds no ambiguity. Indeed, the Court finds it difficult to see how any drafter could express the concept more clearly: the funds can be used, and are to be used, to pay interest on the 2000 bonds as a general matter, but in the event of insolvency, they are to revert back for the benefit of all creditors.[25]

---

(Brozman, C.J.) (same, quoting Lines); In re MMG, LLC, 256 B.R. 544, 555 (Bankr. S.D.N.Y.2000) (Bernstein, C.J.) (same, citing Lines); Caldas, 274 B.R. at 598 (same, citing above cases).

**23.** Investment Agreement at § 12.

**24.** See SISU's Mem. of Law, filed April 24, 2002 (Docket # 31) ("SISU Br.") at 11.

**25.** If parol evidence were considered, comparison to the 1997 Escrow Agreement would strongly reinforce this view, as showing how Netia Holdings could draft an "Escrow Agreement," and create an escrow, when it wanted

to. Likewise, the repeated references in the Prospectus to the fact that the funds at State Street would be available, in the event of insolvency, to all creditors, and the listing of the funds at State Street as assets on Netia South's balance sheet, would also reinforce that view. Inconsistent with that view would be the use by a representative of the Foreign Debtors in the Draft Restructuring Agreement in March 2002 of the words "Escrowed Funds" to refer to the funds that had been deposited with State Street. However, because the Court finds no ambiguity whatever in the words of the Investment Agreement— the relevant contract itself, as contrasted to documents characterizing the Investment

The cases cited by the Objecting Bond-holders do not lead the Court to a contrary conclusion; they are of minimal relevance. *National Union Fire Insurance Co. v. Proskauer Rose Goetz & Mendelsohn,* 165 Misc.2d 539, 634 N.Y.S.2d 609 (Sup.Ct. N.Y.Co.1994), *aff'd on opinion below,* 227 A.D.2d 106, 642 N.Y.S.2d 505 (1st Dep't 1996) (*"Proskauer"*), held, as the Objecting Bondholders urge, that an escrow was created. However, there the defendant Proskauer had *acknowledged* that it had entered into an escrow agreement, *see id.* at 541, 546–547, 634 N.Y.S.2d 609, a matter of no small importance with respect to the court's determination in that regard. To the extent *Proskauer* is relevant here—as it is with respect to its articulation of requirements for an escrow to exist—the Objecting Bondholders fail to satisfy it. With respect to the "relinquishment of control" requirement for any escrow (which the Court considers to be the heart of the issue here), the *Proskauer* court stated:

> [T]he delivery must be intended by the promisor as relinquishment of any right of possession and control of the property.

*Id.* at 545, 634 N.Y.S.2d 609. Yet the last sentence of section 12 of the Investment Agreement here, as the Court has noted, reserves, and does not relinquish, the "right of possession and control" in the event of insolvency, and this case thus fails to satisfy the *Proskauer* standard.

Similarly, in *Musso v. New York State Higher Education Services Corp. (In re Royal Business School, Inc.),* 157 B.R. 932 (Bankr.E.D.N.Y.1993), Chief Judge Duberstein found that an account was an escrow,

but he noted that "the Agreement clearly states that the funds were being held in escrow," *id.* at 936, and that "[t]he Agreement in question characterizes the [account] as an escrow in at least fifteen different places." *Id.* at 938. *Royal Business School* did not discuss the requirement of relinquishment of control over the escrowed property, and it did not deal with contractual language of the character present here—where the right to recover the property for the benefit of creditors in the event of insolvency was expressly reserved.

In another of the cases relied on by the Objecting Bondholders, *Hassett v. Blue Cross and Blue Shield of Greater N.Y. (In re O.P.M. Leasing Services, Inc.),* 46 B.R. 661 (Bankr.S.D.N.Y.1985), Chief Judge Lifland likewise found an escrow to exist, but once more his determination was in the context of an agreement that referred to itself as an "escrow agreement," designated a law firm as an "escrow agent," and made reference to the "escrow deposit." *See id.* at 664. Judge Lifland's decision discussed the ability to attack the removal of funds from the escrow account as a preference under section 547 of the Bankruptcy Code, or otherwise, under a trustee's strong-arm powers, *id.* at 665, and discussed the extent to which an escrow could be reached by creditors—not whether an escrow existed in the first place. His discussion had no occasion to deal with the issues presented here.

Finally, in *Keene Corp. v. Acstar Insurance Co. (In re Keene Corp.),* 162 B.R. 935 (Bankr.S.D.N.Y.1994), Chief Judge Bernstein described the general requirements

Agreement or providing a contrast to it—the Court believes that resort to parol evidence is inappropriate. If another court were to disagree, and conclude that resort to parol evidence is necessary, this Court believes that, especially by reason of their contemporane-

ous and highly specific statements back in the year 2000, and the dramatic contrast between the Investment Agreement for the 2000 Notes and the 1997 Escrow Agreement, the Foreign Debtors would still show the requisite likelihood of success.

for an escrow, including the requirement for relinquishment of control. However, insofar as relevant here, he merely noted the requirement for relinquishment of control, *see id.* at 942, and the fact that Keene had relinquished control over the deposit except for certain limited purposes, such as investment decisions. He too had no occasion to address anything of any relevance to this matter. The other cases cited by the Objecting Bondholders have even less relevance to the issue here, and do not warrant discussion.[26]

### (ii) Alleged Lien

The Court likewise determines that the Foreign Debtors have shown both serious issues going to the merits and a likelihood of success, with respect to Triage's contention, in its joinder with SISU, that the arrangement granted the Objecting Bondholders a lien.[27] Contractual provisions granting such a lien are conspicuously absent. Provisions that might be regarded as substitutes are conspicuously absent as well. As importantly, or more so, the language of section 12 expressly negates such an intent.[28] The Investment Agreement states clearly and unambiguously that no security interest is to be created,

and effect must be given to that expressed intent.

Whatever may be the law with respect to the right to look to surrounding circumstances to divine intent where contractual language is ambiguous, this Court does not believe that it has a license to disregard the language of a contract when it is clear and unambiguous. As noted in this district in *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F.Supp.2d 275 (S.D.N.Y. 1998) (Sweet, J.):

> To determine whether the parties to a transaction intended to create a security interest, courts look to the agreement governing the transaction. Where the parties' intention is clearly and unambiguously set forth in the agreement, effect must be given to the expressed intent.... The objective intent of the parties "expressed or apparent in the writing controls" the agreement's interpretation, while the "undisclosed, subjective intent of the parties has no bearing" on the construction of the contract.

*Id.* at 300 (internal citations omitted).

Under the circumstances here, it would be grossly inappropriate for this Court to

---

**26.** SISU also argues that section 12's last sentence applies not to the funds at State Street generally, but only to those that would remain after all of the four interest payments had been made. (*See* SISU Br. at 15). There is nothing in section 12 of the Investment Agreement—e.g., use of words such as "remaining," "surplus," or words of like import—to support the view that the paragraph is so limited, and this is particularly notable since words of that character were used elsewhere in the Investment Agreement. (*See* Investment Agreement § 9.5) ("If the first four scheduled interest payments on the notes are made in a timely manner, any *remaining* Investment Interest will be released from the Investment Account ..."); *id.* § 12(iii) ("any *surplus* of such cash or cash proceeds held by the Trustee and remaining after payment to the Holders of the Notes ... shall be paid

over to the Payors") (emphasis added in each case).

> In substance, acceptance of the Objecting Bondholders' argument would require a judicial redrafting of the Investment Agreement, and in particular its section 12.

**27.** *See* Triage Joinder at 5–7.

**28.** While this conclusion would be reinforced by reference to the 1997 Indenture, prohibiting most further liens, and, especially, the 1997 Escrow Agreement, demonstrating how Netia Holdings was fully capable of using words like "security interest," "collateral" and "pledge" when it wanted to, the Court once more considers it inappropriate to resort to parol evidence, as the Investment Agreement, making no reference to the creation of a security interest, is not ambiguous.

disregard the clear language in the contract, and engraft upon it terms that its original drafters did not include.[29]

*(iii) Alleged Constructive Trust*

The Foreign Debtors understandably raise concerns as to the extent to which constructive trusts should be imposed in bankruptcy cases when the effect of such is to grant unanticipated interests in assets priority over other creditors; there is also a related concern that imposition of a constructive trust is an equitable remedy that can be satisfied by a money judgment, and hence gives rise to no more than a general unsecured claim entitled to ratable distribution from the bankruptcy estate. However, the Court does not need to decide issues of that nature because it believes that Triage has shown little likelihood of success with respect to the imposition of a constructive trust in the first place—or, putting it in preliminary injunction terms, because the Foreign Debtors have shown both serious issues going to the merits and a likelihood of success with respect to the Objecting Bondholders' claims of constructive trust.

In analyzing the claim of constructive trust, this Court has the benefit of considerable caselaw on the subject under New York law, in the state courts, in the Second Circuit, and in this District.[30] In New York, the stated elements of a claim for constructive trust have been said to be: (1) a confidential or fiduciary relationship, (2) a promise, express or implied, (3) a transfer in reliance on the promise, and (4) unjust enrichment.[31] It has been further held, however, that "[n]otwithstanding the stated requirements, the remedy is a flexible one, and the facts need not satisfy every element in all cases."[32]

Notwithstanding the flexibility which a court might have to dispense with the presence of one (or even more than one) of the traditional factors, where, as here, none or almost none of the factors for imposition of a constructive trust are satisfied, the Objecting Bondholders have shown little likelihood of success, and, conversely, the Foreign Debtors have shown the requisite likelihood that they will prevail. Here the holders of the 2000 Notes are not in a fiduciary relationship with the Foreign Debtors,[33] and though the bond-

---

**29.** *See John Hancock Mutual Life Insurance Co. v. Amerford International Corp.*, 22 F.3d 458, 461 (2d Cir.1994) (courts "should look to the terms expressed in the contract itself rather than to 'extrinsic evidence as to terms that were not expressed' "); *Nationsbanc Commercial Corp. v. Chemical Bank*, 1994 WL 62945 (S.D.N.Y.1994) (Leisure, J.) ("In a case such as this in which the contract in dispute was drafted and negotiated by highly skilled corporate lawyers, it is particularly appropriate for the Court to adhere closely to the language chosen by the parties, rather than speculate as to what the parties might have intended.").

**30.** *See Sharp v. Kosmalski*, 40 N.Y.2d 119, 351 N.E.2d 721, 723, 386 N.Y.S.2d 72 (1976); *Koreag Controle et Revision, S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision S.A.)*, 961 F.2d 341, 352 (2d Cir.1992) (*"Koreag"*), *cert. denied*, 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992); *Tekin-*

*sight.com, Inc. v. Stylesite Marketing, Inc.*, 253 B.R. 503, 508 (Bankr.S.D.N.Y.2000) (Bernstein, C.J.) (*"Stylesite"*); *LFD Operating, Inc. v. Ames Dept. Stores, Inc. (In re Ames Dept. Stores, Inc.)*, 274 B.R. 600, 625 (Bankr. S.D.N.Y.2002) (Gonzalez, J.) (*"Ames"*).

**31.** *See Koreag*, 961 F.2d at 352; *Stylesite*, 253 B.R. at 508; *Ames*, 274 B.R. at 625.

**32.** *Stylesite*, 253 B.R. at 508; *accord Koreag*, 961 F.2d at 354 (the four factors provide important guideposts, but the constructive trust doctrine is equitable in nature and should not be rigidly limited). For example, the court may impose a constructive trust in the absence of a fiduciary relationship. *Koreag*, 961 F.2d at 354; *Stylesite*, 253 B.R. at 508 (citing *Koreag*).

**33.** *See Ames*, 274 B.R. at 626 ("In New York, no fiduciary relationship exists where parties were acting and contracting at arms-length to a business transaction.").

holders may be said to be in such a relationship with State Street, it is not State Street that is laying claim to the funds that the Foreign Debtors wish to make available to creditors generally. More fundamentally (even assuming that the fiduciary relationship requirement has been satisfied or that it can be waived), it is difficult to see how the other three requirements could be satisfied. Any "promise" to the Objecting Bondholders did not cover payment in the event of insolvency, because section 12 of the Investment Agreement expressly disclaimed such a promise. There could not have been a transfer by bondholders in reliance upon any alleged promise, because (apart from section 12), the Prospectus told prospective bondholders, in no uncertain terms, that they would not have a claim to the assets in question in the event of an insolvency proceeding, and they would have no basis for reliance based on any contrary understanding. And there could not be unjust enrichment, in light of the foregoing and the fact that the Foreign Debtors are seeking to do no more than they told bondholders, back in 2000, what they would do—make the funds available to *all* creditors in the event of insolvency, and not just a chosen few.

### (c) Balance of Hardships

The Court also finds that even if it had not found a likelihood of success and were weighing issuance of a preliminary injunction based ruling solely on the existence of serious issues, the balance of hardships would tip sharply in the Foreign Debtors' favor. If the funds leave State Street, they will be distributed to diverse parties, and be difficult or impossible to recover. This is of course a concrete example exemplifying the well-established principle that piecemeal distribution of a debtor's estate constitutes irreparable injury. By contrast, and looking at the other side of the tipping of the scales, there has been no suggestion that the funds are in any jeopardy at State Street, or that keeping them there, pending further order of the Polish court or this Court, would cause anyone any injury whatever.

### 2. Preliminary Injunction Conclusion

For all of the foregoing reasons, the Court concludes that the Foreign Debtors have made an overwhelming case for a preliminary injunction for preserving the status quo.

### 3. Matters Taken Sub Judice

For reasons apparent from the foregoing, the Foreign Debtors have also shown a likelihood of success for recapturing the funds and subjecting them to the further order of the Polish court or this Court. The only material issue in this connection, in this Court's view, is how to deal with issues raised by State Street with respect to the disposition of the funds once State Street hands them over [34]—not whether State Street eventually hands them over to one or another of the Foreign Debtors, but to whom. State Street also raises a second issue with respect to whether the Court should act slowly with respect to the turnover prong, to allow for full litigation and/or appeal.[35]

The issues raised by State Street go to the matter of who should receive the proceeds of the turnover, and, perhaps, when it should be directed, but they do not go to the wisdom of preserving the status quo and protecting the Foreign Debtors' estates from the grabbing of assets, on ei-

**34.** *See* State Street's Response, filed April 24, 2002 (Docket # 30), at 4.

**35.** *Id.*

ther an interim or permanent basis. The issues raised by the Objecting Bondholders have largely been dealt with, but the Court recognizes that in issuing a preliminary injunction within the time periods required under the Federal Rules of Civil and Bankruptcy Procedure, and making determinations that could be made solely on the basis of serious issues and the likelihood of success, the Court did not need to, and did not, make final determinations with respect to the parties' contentions on the merits.

The Court will take the remaining issues—(1) turnover and (2) final injunctive relief—under submission. The Court will accept further submissions with respect to open items within the next 30 days, provided that if any party wishes to submit anything further, it should coordinate with its adversaries with respect to agreement on a briefing schedule. There will be no further oral argument unless the Court hereafter concludes that such is necessary.

### Conclusion

The Foreign Debtors' motion, insofar as it seeks a preliminary injunction preserving the status quo and protecting the estate against dismemberment of its assets, is granted; the remaining matters are taken under submission. The Foreign Debtors are authorized and directed to settle a preliminary injunction order on five business days' notice.